## MOORE v. CURRY.

1. COVENANTS—ENFORCEMENT—EQUITY—INJUNCTION.

Equitable jurisdiction to enforce covenants is not absolute, but is governed by the same general rules which control equitable relief by specific enforcement: if the restrictive covenants in a deed were made with evident reference to the continuance of the existing general condition of the property and its surroundings, but in the

lapse of time there has been a complete change in the character of the neighborhood, so as to defeat the purposes of the covenants and to render their enforcement an inequitable and unjust burden on the owner of the lots, the equitable relief will be denied and complainant left to his legal remedy.[1]

2. SAME—INJUNCTION—RESTRICTIVE COVENANTS—RESIDENCE PROPERTY.

In a suit to enjoin defendants from erecting a store building on Woodward avenue, in the village of Highland Park, in violation of restrictions imposed when the property was placed upon the market, evidence *held*, to sustain a decree enforcing the restrictive covenants in the several conveyances, on the ground that the character of the district had not so materially changed as to make it inequitable to enjoin a breach of the restrictions.

Appeal from Wayne; Donovan, J. Submitted April 22, 1913. (Docket No. 135.) Decided July 18, 1913.

Bill by Charles T. Moore and others against John Curry and others for an injunction and other relief. From a decree for complainants, defendants appeal. Affirmed.

*Lodge & Brown,* for complainants.

*Friedman, Smilansky & Blumrosen,* for defendants.

STEERE, C. J. The bill in this case was filed to enforce certain building restrictions and restrain the erection of a certain store building for business purposes, as proposed by defendants, on property situated at the northeast corner of Woodward and Currystone (or Grand) avenues in the village of Highland Park, a suburb adjoining the city of Detroit on the north. The property in question is part of a subdivision laid out by defendants Curry in 1905; the

---

[1] On the question of injunction against sale of, or proposal to sell, real property to person, or for purpose regarded as undesirable, see note in 44 L. R. A. (N. S.) 228.

same being platted and many lots in said subdivision sold before the plat was placed on record.

The bill is filed by 48 owners of lots in this subdivision, each of whom owns one or more lots which were purchased from defendants Curry or their agents, and most of whom have built homes and reside upon their lots. The substantial allegations in their bill, supported by abundance of uncontroverted testimony, are that they were led to purchase because Highland Park was and is pre-eminently a suburban village of homes, free from noise, bustle, dirt, business confusion, saloons, and other deteriorating influences detrimental to home life; that said subdivision was put upon the market as a strictly residential district, large signs being placed upon the land stating that the lots were to be sold under such restrictions; that circulars and other special advertising matter were brought to their attention emphasizing this and announcing that the vendors when conveying would embody proper limitations to that effect in the instruments given; that agents of the owners, when showing complainants the property, dwelt upon the fact that it was particularly desirable for, and would be restricted to, residences, and therefore be entirely free from business houses, saloons, double houses, flats, public places, and anything which would be detrimental to home surroundings, it being the intention of the owners to require that only private dwellings should be erected upon any of the lots contained in said subdivision; that attention was also called by said agents to large stone pillars erected, or to be erected, at the entrances of two streets of the subdivision leading from Woodward avenue, which is the main thoroughfare running northerly through the city of Detroit and continuing on through Highland Park, and it was stated that fine residences would be erected upon this subdivision entirely across the front on said avenue, 12 of the 312 lots in said subdivision

being situated on the east side thereof, and the attention of some of complainants was particularly called to the lots now in question, upon which it was stated there would be a $6,000 residence erected fronting on Woodward avenue, according to restrictions; that all of said complainants purchased the lots now owned by them relying upon such inducements and promises made by defendants Curry and their agents that all lots in said subdivision would be so restricted and kept under such restrictions, and that in reliance thereon complainants built homes upon their lots, ornamenting and beautifying their grounds, and have established their residences there at large expense; that they were induced to make such investments by reason of the environments and representations so made that it would be a restricted, quiet, suburban district, free from factories, saloons, and other things detrimental to home making.

While no building restrictions are contained in the recorded plat of this subdivision, all contracts of sale and deeds of lots given by the platters contained restrictions in harmony with the foregoing representations. It is undisputed that all lots sold in said subdivision by defendants Curry, including the lots upon which defendants contemplate erecting a store building, were sold subject to residential restrictions. The contract under which defendants Robinson, Levin, and Wetsman hold the corner upon which they contemplate and began the erection of the structure objected to by complainants is dated December 29, 1910, and contains the following language:

"That no business house, saloon, public schools, churches, store houses, manufactories, apartment houses, double houses, flats, or public places of any sort shall be erected on said lot that may be considered an annoyance on a private residence street; it being the intention that only one private dwelling shall be erected on or occupy each lot herein described. That, as a part and further consideration of the sale as

hereby made, the parties of the second part shall erect on said lot a suitable private dwelling at least two stories high, to cost not less than $4,000; said dwelling to be not less than 40 feet from the front line of said lot and not less than 10 feet from the southerly line of said lot 10. No barn or outbuilding to be erected nearer to the said lot line than 60 feet and shall not build any building for the purpose of carrying on business thereon."

The testimony shows clearly that these restrictions were familiar to the defendants who propose erecting the store, and that they had tentative plans prepared and started the work by digging a small trench outlining the limits of the proposed building, to test the attitude of residents in the district and in anticipation of possible litigation. Defendant Robinson testifies:

"When we got this contract, we saw that the restrictions were there and we spoke to Mr. Potter (Curry's agent) about it. * * * I said, 'Being as I want to put up some stores, I want to see if there is anything to prevent it.' * * * Mr. Potter said he would put out the sign there that there would be stores. * * * That was done simply as a matter of business, that we were putting up stores there. We dug a trench about a foot wide and a foot or fifteen inches deep. We began that about four months ago and I understand the suit followed. * * * I have not exactly bought any material for it."

Witness further testifies:

"Mr. Charles F. Curry was the man I talked with. I asked about putting up more stores. * * * He said, 'You know it has restrictions;' and he says that 'there might be some trouble;' that is all he said."

As late as July 22, 1910, defendant Charles F. Curry filed a bill of complaint in the Wayne circuit court in chancery against certain parties to restrain them from erecting a two-family flat upon lots 138-139 of said subdivision, alleging the same was in violation of the building restrictions; that he was bound

to enforce the same for the protection of himself and others to whom he had sold lots; and that the erection of said flat would result in irreparable damage to himself and all resident owners on Currystone avenue.

It is conclusively shown and practically conceded that the subdivision has been built up, developed, and improved as a strictly residential district; that the restrictions have been generally observed; and the erection upon said property of such a building as defendants propose would be a palpable violation of the restrictions found in their contract and imposed upon all purchasers in the subdivision unless changed, and unusual conditions render such restrictions no longer operative.

In the final analysis counsel for defendants raise for consideration and discuss but the one proposition that the environments and character of the locality, and especially that portion fronting on Woodward avenue, have so changed since the platting of this property that equity ought not to enforce this restriction. In support of this a rapid and phenomenal growth of the city of Detroit and its suburbs is shown, especially extending out Woodward avenue and into Highland Park in and around this subdivision. Testimony was introduced showing that Woodward avenue frontage in that locality is not desired or in demand for residence purposes; that it has become a business street and property on it only in demand for business purposes; that unrestricted land fronting on it sells much higher than that restricted; that 16 stores have been erected on said avenue within a block of Currystone; that most of them were erected since 1906; and that various kinds of merchandising, such as are usually conducted in the business part of a municipality, are conducted in said stores.

The trial judge, before whom the witnesses were produced and testified, personally inspected the premises in controversy for a better understanding of

their testimony and made a finding of facts in connection with his opinion. As to the physical conditions of the property found by him after an inspection, in the light of the testimony given, he says:

"The court has made a personal inspection of the premises in controversy and of the property on both sides of Woodward avenue from the southerly limits of Highland Park village to the northerly limits thereof. From the testimony in this case, which has been verified by said inspection, the court finds that there is much vacant property on both sides of Woodward avenue throughout its entire length within said village; that there is apparently abundant room along the course thereof for the erection of such business places as may be necessary for the comfort and convenience of said section for many years to come; and that neither the comfort nor convenience of said section nor the inhabitants thereof nor of said neighborhood will be promoted or increased by the erection of a business house upon the premises in controversy. The entire section is new. There are but two houses upon Woodward avenue in Highland Park village that can lay claim to very great age, and those are two residences. * * * What store buildings and business houses do exist upon Woodward avenue are all evidently of recent erection. * * * New residences in the immediate vicinity of the property in question have recently been finished on Woodward avenue. The subdivision itself is only about six years old. What store buildings have been erected in the neighborhood are only two or three years old."

The doctrine which is invoked in behalf of defendants is quoted from and clearly stated in 3 Pomeroy's Equity Jurisprudence (3d Ed.), p. 2596, as follows:

"The equitable jurisdiction to enforce such covenants is subject to one most important limitation. It is not absolute, but is governed by the same general rules which control the equitable relief of specific performance of contracts. If, therefore, the restrictive covenants in deeds of lots were made with evident reference to the continuance of the existing general condition of the property and its surroundings, but in

the lapse of time there has been a complete change in the character of the neighborhood, so as to defeat the purposes of the covenants and to render their enforcement an inequitable and unjust burden on the owner of the lots, then the equitable relief will not be granted, and the plaintiff will be left to his remedy at law. For example, if the covenants restricted the grantees of lots to use for purposes of residence, and since their execution the whole neighborhood had ceased to be used for such purposes, and had been wholly given up to business, manufacturing, and the like."

This principle has been applied in numerous cases cited by counsel and is recognized by this court in *Frink* v. *Hughes,* 133 Mich. 63 (94 N. W. 601), wherein it is said:

"We think the decree of the court below has sufficiently protected the defendant when, by its terms, it has left it open to him to bring to the attention of the court any changed conditions in the property which may take place at a later day."

In view of the proof of development and changing conditions in the vicinity of the subdivision, we think it would be proper to not foreclose bringing to the attention of the court any marked changed conditions of the property in the future, but at the present time the equities as well as the law are with complainants. At the present time Highland Park, taken as a whole, yet remains distinctively a suburban, residential village built up largely of houses of those whose business and labors are in Detroit. It is growing rapidly and chiefly from the city overflow. The great bulk of its population go there for homes, not for business. To accommodate such population, certain kinds of business have followed, and buildings to accommodate such business have been built in that locality along Woodward avenue. The most desirable sites for business will command a better price for such purposes than for residences. This is true of every

restricted district which has developed to a point where the population and environments make a local demand for business. Since the construction of a belt line railroad around the city of Detroit, a few large factories, including the Ford automobile works, have been erected in the village on or near said belt line. This has increased the importance and population of said village, but its original distinctive characteristic as a village of suburban homes yet remains. To accommodate the inhabitants of the village as the population increased, the number of business places along Woodward avenue has increased; but it is shown there are sufficient to supply the needs of the community now and unrestricted vacant lots convenient for more when needed, and it is by no means shown that the whole neighborhood has ceased to be adapted to and used for residences and been given over to business. It is shown that it would be an injury to the residents on this subdivision for stores to be erected on the front along Woodward avenue with their rears towards the homes upon the subdivision and cutting off a view of the avenue. By their contracts the purchasers of lots in the subdivision back of Woodward avenue are entitled to have either a view in that direction or a line of appropriate residences fronting upon it. The only equitable consideration for refusing this relief, under present conditions, is that the lots on Woodward avenue would sell for more with the restrictions removed. This is not sufficient.

No such radical change has been shown in the environments and character of the neighborhood in which the restricted district is situated as to invoke the limitation contended for and justify the court in refusing at this time the relief asked.

The decree is affirmed, with costs.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.