# Celia Gordon et al., Appellees, v. James T. Caldwell et al., on appeal of James T. Caldwell, Appellant.

## Gen. No. 29,362.

1. BUILDINGS AND BUILDING RESTRICTIONS—*apartment hotel as violation of restriction limiting construction to private dwellings.* A building restriction providing that no building shall be erected or used on the lots in question except as "a private dwelling house" prohibits the erection of an apartment hotel.

2. BUILDINGS AND BUILDING RESTRICTIONS—*evidence of violation of building restriction.* In a suit to enjoin the violation of a building restriction which limited buildings on the lots in question to private dwelling houses and prohibited building, except the usual projections, within 25 feet of the street, testimony of defendant's architect that the building plans called for a foundation the entire length of the lot constituted direct proof of a violation of the restriction as to the building line.

3. MUNICIPAL CORPORATIONS—*effect of "zoning" ordinance or building restrictions.* While the classification of a certain district for commercial and apartment purposes by a zoning ordinance of the City of Chicago passed pursuant to the Zoning Act of 1921, Cahill's Ill. St. ch. 24, p. 547, tends to support the theory that the lots in such district are better adapted to other uses than private residences, such ordinance neither attempts to deprive nor has the effect of depriving the owners of such lots of their rights under building restrictions so long as such restrictions do not endanger or threaten the safety, health and comfort or general welfare of the public.

4. BUILDINGS AND BUILDING RESTRICTIONS—*when lot owner not estopped to restrain violation of building restriction.* The fact that one of the complainants in a suit to enjoin the violation of a building restriction limiting buildings on the lots in question to private residences with a building line 25 feet from the street, by mistake of her contractor, built the wall of her residence one foot over the building line, would not bar her from complaining of the building of an apartment hotel covering an entire lot nor would it preclude the other complainants from obtaining the relief asked.

5. BUILDINGS AND BUILDING RESTRICTIONS—*extent of injunctive relief against violation of building restriction.* Though there have not been such changes in the conditions of a locality in which is a tract restricted by covenants to private dwellings as to warrant a court of equity in refusing to enforce such covenants, an injunc-

Gordon v. Caldwell, 235 Ill. App. 170.

tion to restrain their breach for the full period of the covenants, nearly twenty years, will be modified so as not to foreclose the privilege of bringing to the attention of the court any marked change in the condition of the property which would render the continuation of the injunction inequitable.

Appeal by defendant from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1924. Reversed and remanded with directions. Opinion filed December 16, 1924. Rehearing denied December 27, 1924.

LEESMAN & ROEMER, for appellant.

JOSEPH B. LAWLER, for appellees.

MR. JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a decree enjoining appellant Caldwell and his contractors, Thorgensen & Ericksen, from erecting on lot 4 of Dresden's resubdivision of land lying in that part of Chicago known as Rogers Park, any building or structure in violation of certain building restrictions in agreements entered into between the several owners of the lots in that subdivision.

The agreements referred to were entered into March 10, 1911, and May 13, 1912, the latter merely reaffirming the former except as to the building line of lot 13 of the resubdivision. Caldwell was a party to the latter agreement and was then the owner of lots 5, 6 and half of lot 7. He became the owner of lot 4 in January, 1923.

Among the covenants and restrictions of said agreements are the following:

"*First.* That no building or structure or part of any building or structure, except bay windows, verandas, porches, steps and other usual projections appurtenant to a building wall, shall be erected on Lots 1 to 4, both inclusive, aforesaid, within twenty-five feet of the street adjoining said lots and known as

Forest avenue.''    (Now North Paulina street.)

"*Sixth.*   That no building to be erected on said premises aforesaid shall be erected or used otherwise than as a private dwelling house and outbuildings thereof, and no such building shall be erected or used as an apartment, flat or tenement house.''

"*Ninth.*   That this agreement and covenant shall exist and be in force for a period of thirty-three (33) years from and after the date hereof and no longer.''

The bill charged a violation of the restrictions in said paragraphs first and sixth. The main defense interposed was that there had been such a change in the neighborhood since the execution of said agreements that a court of equity would relegate the parties to their remedy at law. The proof related mostly to the changes that had taken place.

Said resubdivision includes the greater portion of a triangular piece of territory bounded on its east side by North Paulina street, which runs north and south, on its south side by Jarvis avenue, running east and west, and on its northwest side by Rogers avenue, which runs diagonally northeast and southwest and intersects the other two streets. It contains seventeen lots. Lots 1 to 4 inclusive (numbered consecutively from the north to the south) front on Paulina street, lots 5 to 12 inclusive (numbered consecutively to the west from Paulina street) front on Jarvis avenue, and lots 13 to 17 front on Rogers avenue. The southwestern part of the triangle, comprising three other lots, is not included in the subdivision.

The deed to defendant Caldwell of lot 4, dated January 10, 1923, refers to the restrictions in said agreement. In October of that year he proceeded through the other defendants, Thorgensen & Ericksen, his contractors, to excavate and lay a foundation for an apartment hotel on said lot 4 in disregard of the restrictions in the above-quoted paragraphs of the agreement. There is now a private dwelling house on each of the lots except 4, 5 and 6 and the east part of

7 owned by defendant Caldwell, and lots 11 and 13. There is no building erected or used as an apartment, flat or tenement house in said subdivision.

The court found the equities for complainants, owners of several of the lots, and that there had been no such change in the character of the neighborhood as to defeat the purpose of the restrictions imposed upon the aforesaid property and to render the enforcement of such restrictions unreasonable; and the decree enjoins defendants and their agents until the 9th day of March, 1944, from building or attempting to build on said lot 4 any apartment, flat or tenement house or a building to be used as such or otherwise than as a private dwelling house, and from erecting or attempting to erect any building on said lot 4 within 25 feet of the street adjoining except bay windows, etc., as provided in said paragraph sixth.

Before referring to the main issue whether the changes in that neighborhood are such that a court of equity will not enforce said restrictions, reference will be made. briefly to other points made by appellants which we think are untenable.

The first is that under a strict construction of paragraph sixth it cannot be said that the erection of an apartment hotel is excluded by its terms; that while it provides that no building shall be erected or used as such except as "a private dwelling house" it does not expressly prohibit the erection of an apartment hotel, which, as testified to, is distinguished from an apartment in its flexible plan by which the apartments can be divided into one or more rooms. We think the agreement clearly contemplated that no other structure should be erected on any of said lots than a private dwelling house and the outbuildings thereof, and that other parts of the agreement providing that no building should be erected on said subdivision to be used for purposes of trade, manufactory "or other business of any description * * * or as a hotel

or place of public resort" tend to support that construction.

It is also contended that there was no direct proof of a violation of the restrictions as to the building line. The record shows that Caldwell's architect testified that the building plans called for a foundation 134 feet long, the entire length of the lot as shown by a plat annexed to defendant's answer to which it refers for a description of the locality.

It is urged that the restriction is against the policy of the so-called Zoning law, enacted in 1921 (Cahill's Ill. St. ch. 24, p. 547). Pursuant to the additional powers conferred upon city councils by said law an ordinance of the City of Chicago was passed dividing the city into residence, apartment, commercial and manufacturing districts, and by it a part of said Dresden's resubdivision, including lot 4 in question, is zoned for commercial purposes and the rest of the subdivision as an apartment district.

While such classification of said resubdivision tends to support the theory of the defense that the lots are better adapted to other uses than for private dwelling houses, yet neither said law nor said ordinance attempts to deprive lot owners of the benefits of covenants or agreements affecting the uses of their property. Notwithstanding said ordinance the owners of said lots have the constitutional right to make use of them in accordance with such restrictions, so long as they do not endanger or threaten the safety, health and comfort or general welfare of the public (*People v. City of Chicago*, 261 Ill. 16, 21); and the fact that said subdivision has been so classified does not require the owners of said lots to yield the rights secured by such covenants. We fail to see that their enforcement in anywise contravenes public policy.

It is also urged that because complainant Celia Gordon, owner of lot 3, built her house so that the wall was a foot over the building line and the eaves

about two and one-half feet further over the line, equity will not grant her relief. The evidence was to the effect that this encroachment over the building line was unintentional and due to a mistake on the part of the contractor. Even if complainant Gordon could not complain of defendant's violation of the building-line restriction it would not bar her from complaining of the character of the building proposed to be erected, nor would it preclude the other complainants from obtaining such relief; and, for aught that appears to the contrary, the owners of the other lots in said subdivision have not objected to such encroachment.

But the main defense is that in consequence of marked changes since the agreements were entered into, in the character and use of buildings in the neighborhood of said subdivision, a court of equity will not enforce such restrictions.

That part of Rogers Park to which the evidence relates lies along Lake Michigan in the northeast part of Chicago and covers a territory approximately twelve city blocks north and south, and six to eight east and west. The subdivision in question is about four blocks south of the north limits of Rogers Park and within a block or so of its western limits.

Much of that part of Rogers Park near said subdivision was vacant property or occupied only here and there by single dwelling houses at the time said agreements were entered into. There were then only six apartment buildings in Rogers Park. Since that time the development in that locality has been very rapid. Public records show that thirteen hundred apartments and thirty-seven houses were erected in Rogers Park in the year 1922. The buildings on Rogers avenue and Clark street—which runs north and south and touches the southwest angle of said triangular piece of land—are now used mostly for business purposes or as apartments, and similar structures

have been erected in the several blocks adjoining said subdivision, and in fact on that part of said triangular piece not included in the resubdivision. The Northwestern Railroad is a short block west of Clark street running in the same general direction, and the territory between the two is largely covered by apartments or structures devoted to business purposes. The same may be said of a large part of the territory north of said subdivision and of most of the territory in the southeast part and northeast part of Rogers Park bordering Sheridan road which parallels the lake about one block therefrom. Running northerly about two blocks west of Sheridan road is an electric road which turns from a point halfway between the northern and southern limits of Rogers Park to the northwest and intersects Rogers avenue about a block from said subdivision. Along this electric road are many similar structures.

Defendant Caldwell predicates his defense on these facts and that they indicate a probability that much of this territory will in the future be covered by similar buildings and structures.

But, on the other hand, while there were only four buildings in the subdivision in question when the agreements were executed there is now one on each lot except those owned by defendant Caldwell, and two small lots, 11 and 13. Some of these houses were quite costly. Together with the lots 50 feet wide, estimated at about $125 a foot, those on lots 3 and 6 are valued at about $25,000 each, and that on lot 2 about $17,000. Most of the lots along Jarvis avenue in that vicinity and on Malvern avenue running north from said subdivision are still occupied by single private dwelling houses.

The restrictions as to said subdivision have been adhered to until defendant Caldwell attempted to erect an apartment hotel on lot 4, and the evidence shows that the erection of such a building would un-

questionably impair the value of all the lots in said subdivision for the purposes contemplated by the agreements.

It is also true that the evidence shows that the value of said lots for other purposes would be enhanced by the removal of said restrictions. In a similar case, *Moore v. Curry,* 176 Mich. 456, that fact was held insufficient to defeat the enforcement of like restrictions. But it is also apparent that the enhanced value for such purposes would not be sufficient to compensate the owners of the more valuable houses for their destruction or removal, to enable the lots to be used for the so-called higher and better uses to which they may now be put by reason of such changes.

The question arises, therefore, whether under all the circumstances complainants should be deprived of the use of their property for the purposes said covenants were intended to conserve.

First, it may be said that the interests or equities of defendant Caldwell as owner of three and one-half of said lots that are vacant can hardly be deemed paramount to those of complainants who own and have private dwelling houses of considerable value on their respective lots. Nor is his position in securing said lot 4 in 1923, with full knowledge of said restrictions and with the apparent intent of violating said covenants, in which he himself had joined, calculated to impress a court of equity with the merits of his defense. He should be required to keep his solemn covenants unless it can be said the character of the neighborhood has so changed as to defeat the purpose of the covenants and render their enforcement unreasonable.

It was said in *Star Brewery Co. v. Primas,* 163 Ill. 652, that in most cases where the courts have refused to enforce such restrictions will be found two elements, namely:

''First, the change in circumstances has resulted

from some act or acts of the grantor in the deed or of those holding under him; second, the enforcement of the covenant will work a serious injury to the property or property rights of the grantee in the deed, or of the party against whom it is sought to enforce the covenant." (p. 660.)

We think neither of these elements is present in the case at bar, and that one strong reason for granting relief in this case is that private dwellings have been erected on most of said lots in reliance upon the protection offered by the covenants against the erection of any other class of buildings.

While complainants' injuries may not be irreparable it is a well-settled doctrine that equity will interpose by injunction to prevent the breach of negative averments, although damages from the breach may be recoverable. In such cases equity proceeds upon the ground of the express stipulation of the parties alone irrespective of whether substantial injury results or not. (*Consolidated Coal Co. of St. Louis v. Schmisseur*, 135 Ill. 371.) However, relief will not be granted in all cases.

It would avail little to distinguish here cases cited by appellant where upon somewhat variant facts and circumstances from those in the present case the courts refused to enforce similar restrictions because of radical changes. The merits of each case must necessarily rest upon its own particular facts and circumstances in determining whether the changes have been such as to defeat the purpose of the covenants, or render them unreasonable. On these two points we cannot say that the chancellor's findings are not amply supported by the evidence, or that the changes in the environment and neighborhood are so radical as either to defeat such purpose or as to render enforcement of the restrictions inequitable or an unjust burden on defendant Caldwell, even if he were in a position to complain of their enforcement. But

he not only purchased the lot in question with a view to speculating upon the chances of defeating such restrictions but he was a party to covenants which manifestly contemplated the possibility of existing environments and the prevention of like conditions in said subdivision.

But we do not think the injunction should be for the full period of nearly twenty years the covenants have still to run. The swift changes and rapid developments that may come in that period cannot be reckoned with any degree of certainty at this time. The growth, expansion and change in a similar period of time in various parts of Chicago in the past render it futile to predict what and where changes may not occur incident to its future development. It is a matter of common observation that in modern cities whole localities undergo a radical change of values and uses in a brief period by the introduction of new enterprises or new lines of transportation. Such changes cannot always be foreseen.

We are of the opinion, therefore, that while complainants are entitled to an injunction against the breach of such restrictions it should, in view of possibly more radical changes in that locality, be so modified as not to foreclose the privilege of bringing to the attention of the court any marked change in the condition of the property that may occur in the future which would render the continuance of the injunction inequitable and an unjust burden on the owners of the lots. Such was the effect of a decree in *Frink v. Hughes*, 133 Mich. 63, and *Moore v. Curry*, 176 Mich. 457, and when the restrictions considered in the *Moore* case were again brought before the court further changes in the locality rendered it unreasonable to enforce them. (*Windemere-Grand Improvement & Protective Ass'n v. American State Bank of Highland Park*, 205 Mich. 539.)

It becomes necessary, therefore, to reverse the de-

cree with directions for a modification thereof as herein indicated.

*Reversed and remanded with directions.*

FITCH, P. J., and GRIDLEY, J., concur.