(No. 20272.—■■■■■■■)

THE DREXEL STATE BANK OF CHICAGO, Trustee, *et al.* Appellees, *vs.* FRANCES B. O'DONNELL, Appellant.

*Opinion filed April 23, 1931—Rehearing denied June 3, 1931.*

ALBERT G. MILLER, for appellant.

174

McGilvray, Eames, Vaughan & Tilley, (Franklin E. Vaughan, of counsel,) for appellees.

Mr. Commissioner Edmunds reported this opinion:

On April 6, 1928, the Drexel State Bank, a corporation, as trustee, and Clarence Poffenberger and Andrew J. Kolar as beneficiaries under the trust, filed a bill in the superior court of Cook county to remove a certain building restriction as a cloud on the title of 40½ feet of lot 2 in a described subdivision in the city of Chicago. The cause was referred to a master, who recommended that the relief prayed be granted. From a decree entered in accordance with this recommendation Frances B. O'Donnell, one of the four defendants, has appealed.

On March 3, 1903, Eugene S. Kimball conveyed to J. Milton Trainer lots 2 and 3 in the subdivision in question. Lot 2 lay at the southeast corner of Greenwood avenue and East Forty-fifth street, fronting 55.6 feet on Greenwood avenue and 198 feet on East Forty-fifth street, and lot 3 lay immediately south of lot 2, fronting 50 feet on Greenwood avenue. Among other provisions the deed contained the following: "The said J. Milton Trainer as a part of the consideration hereof covenants and agrees to and with the said Eugene S. Kimball, and this conveyance is made, subject to the following restrictions and limitations as to the use of the west 148 feet of said lots 2 and 3, first, said J. Milton Trainer will not and his heirs and assigns shall not, on or before April 3, 1907, erect or suffer or permit to be ercted on said west 148 feet any flat or apartment building; second, said J. Milton Trainer will not, and his heirs and assigns shall not, on or before April 3, 1907, erect or suffer or permit to be erected on said west 148 feet, any building or improvements, except three detached dwelling houses, to front on Greenwood avenue, Chicago, Illinois; third, said J. Milton Trainer will not, and his heirs, executors and assigns shall not, on or before April 3,

1907, place any building or structure on said west 148 feet, the west line of which building or structure shall extend west of a line parallel to and 40 feet east of the east line of Greenwood avenue, Chicago, Illinois; which said covenants and agreements shall be construed as covenants running with the land." This instrument was duly recorded.

On March 15, 1905, J. Milton Trainer and wife conveyed and warranted lots 2 and 3 to the Chicago Title and Trust Company as trustee. This deed, which was duly recorded, contains, among other provisions, the following: "Also subject to the following restrictions and limitations as to use of west 148 feet of said lots 2 and 3: 1st, said Chicago Title and Trust Company will not on or before April 3, 1907, erect or suffer or permit to be erected on said west 148 feet any flat or apartment building; 2d, said Chicago Title and Trust Company will not on or before April 3, 1907, erect or suffer or permit to be erected on said west 148 feet any building or improvement except three detached dwelling houses to front on Greenwood avenue; 3d, said company shall not on or before April 3, 1907, place any structure on said west 148 feet within 40 feet of Greenwood avenue. To have and to hold the said premises with the appurtenances upon the trusts and for the uses and purposes herein set forth. Full power and authority is hereby granted to said trustee to improve, manage, protect and subdivide said premises or any part thereof, to dedicate parks, streets, highways or alleys, and to vacate any subdivision or part thereof, and to re-subdivide said property as often as desired, to contract to sell, to sell on any terms, to convey either with or without consideration, to donate, to dedicate, to mortgage, pledge or otherwise encumber, to lease, to partition, or to exchange said property, or any part thereof, for other real or personal property, to grant easements or charges of any kind, to release, convey or assign any right, title or interest in or about said premises, and to deal with said property and every part thereof in all other ways

and for such other considerations as it would be lawful for any person owning the same to deal with the same, whether similar to or different from the ways above specified, at any time or times hereafter, and before the end of twenty-one years from the date hereof. In no case shall any party, to whom said premises, or any part thereof, shall be conveyed, contracted to be sold, leased or mortgaged by said trustee, and in no case shall any party dealing with said trustee in relation to said premises, be obliged to see to the application of the purchase money, rent, or money borrowed or advanced on said premises, or be obliged to see that the terms of this trust have been complied with, or be obliged to inquire into the necessity or expediency of any act of said trustee."

On May 11, 1905, an indenture was executed by Eugene S. Kimball and J. Milton Trainer reciting the conveyance by Kimball to Trainer of the above described premises and the conveyance of Trainer to the Chicago Title and Trust Company as trustee, and providing that the restrictions in said deeds pertaining to the building line should not apply to the erection of bay windows, porches or front steps. This indenture was duly recorded.

On May 11, 1905, the Chicago Title and Trust Company entered into an agreement with David S. Googins and his son-in-law, Frederick W. Moore. This agreement, which was duly recorded, recites that "whereas said trust company has this day sold and conveyed to said Moore the south 32½ feet and to said Googins the north 32½ feet of the premises situated in the city of Chicago, Cook county, Illinois, described as lot 3, and the south 15 feet of lot 2," subject to certain conditions as to the use and occupancy of the premises; that the trust company still owns the remaining 40½ feet of lot 2, and the parties have agreed, as part consideration for the sale to Moore and Googins, that like conditions as to use and occupancy shall hereafter pertain to the remaining 40½ feet and that a certain easement

should be created over the same: "Now therefore * * * the parties hereto do agree with one another as follows: No flat or apartment building shall ever be erected upon said 40½ feet of said lot 2 now owned by said trust company and only one detached dwelling house with barn and ordinary appurtenances thereto shall at any one time be upon said premises, such house to front on Greenwood avenue, and no building or structure which shall be placed on said premises shall extend west of a line parallel to and 40 feet east of the east line of Greenwood avenue, excepting bay windows, porches or front steps. A perpetual easement of passage over the east eight feet of said lots 2 and 3 for the ordinary usages of a private alley is hereby created and dedicated by the parties hereto for the sole use and benefit of the present and all future owners of said lots 2 and 3. * * * All of the foregoing covenants and privileges shall be construed as running with the land and shall extend to and be binding upon all future owners of the premises above de-.scribed." On that same date the Chicago Title and Trust Company executed deeds to Moore and Googins as stated in the agreement, which deeds were duly recorded.

In 1905 Googins and Moore built ten-room, three-story brick private residences on these holdings, and the residences are now worth around $25,000 each. The property conveyed to Googins was owned by him until his death and was then conveyed to Paul Byrne, who conveyed it in 1924 to Frances B. O'Donnell, his sister, appellant. The property conveyed to Moore is still owned by him, and he was made a defendant in this proceeding.

The 40½ feet thus remaining in the Chicago Title and Trust Company after these conveyances is bounded on the west and north by Greenwood avenue and East Forty-fifth street. It was retained by the trust company until December 9, 1922, when it was conveyed to Hugh Daly, father-in-law of Paul Byrne. This deed, which was duly recorded, contained no restrictions or limitations on the use of the

property. On or about November 24, 1925, appellee Poffenberger entered into a written contract with Daly to purchase the property for $10,000, the contract providing that the premises should be conveyed by general warranty deed, subject, among other things, to "building or liquor restrictions of record, if any." In entering into this contract Poffenberger acted in behalf of himself and appellee Kolar. Under the provisions of a trust agreement dated February 17, 1927, on February 19, 1927, Daly by deed of trust conveyed the property to the Drexel State Bank. This instrument contained no restrictions or limitations on the use of the property. On July 17, 1927, the bank executed a declaration of trust, naming Poffenberger and Kolar as beneficiaries.

The chancellor found that at the time they entered into the purchase contract Poffenberger and Kolar had no knowledge of the existence of the restrictions upon the use of the premises; that appellant and Moore lived in single-family residences upon the property acquired by them as above stated, and that neither they nor their predecessors in title had violated the restrictions contained in the agreement of May 11, 1905. After making various findings with reference to the erection of apartment buildings on other streets the chancellor found that no buildings have been erected on either side of Greenwood avenue between Forty-fifth and Forty-sixth streets since the erection of the two houses owned by Moore and appellant, with the exception of an apartment building located at the northeast corner of Greenwood avenue and Forty-sixth street, which was erected about twenty-three years ago; that one residence on the east side of Greenwood avenue between Forty-fifth and Forty-sixth streets was converted into an apartment building about two years ago and that two houses on the west side of Greenwood avenue between said streets have been remodeled and are used for taking in boarders and roomers; that on the east side of Greenwood avenue between Forty-

fourth and Forty-fifth streets, commencing at the northeast corner of Forty-fifth and Greenwood, five buildings containing 139 apartments have been erected in the past three years; that on the west side of Greenwood avenue between Forty-fourth and Forty-fifth streets one apartment building containing six apartments was erected about ten years ago; that while this case was pending the premises at the northwest corner of Greenwood avenue and Forty-fifth street, being a large residence, were sold and the residence is in process of being converted into six apartments; that the improvements on both sides of Greenwood avenue between Forty-fifth and Forty-sixth streets are substantial buildings; that no apartments have been built in the district hereinafter described by boundary since appellees contracted to purchase the property in question; that 90 per cent of the persons occupying houses in the district bounded on the north by East Forty-fourth street, on the west by Ellis avenue, on the south by East Forty-sixth street and on the east by Woodlawn and Lake Park avenues, approximately a quarter section of land, own the same, the premises in question being approximately in the center of this district; that the total number of buildings in said district used as single dwellings is 134; that of the frontage shown, approximately 27.3 per cent is occupied by apartment buildings and approximately 24.8 per cent is occupied by houses converted into apartments and houses which take in roomers and boarders; that the territory surrounding the property in question and included in the described district "can no longer be classed as a private residential neighborhood, but that during the period from May 11, 1905, to the present time said territory has, from said improvements and the use thereof, been changed to an apartment and rooming house district; that owing to such change, if said premises in question were improved by a private residence at the present time it would be impossible to obtain from such private residence a fair return upon the investment; that the best

and highest use of the premises in question, and the only demand for the same, is for use when improved with an apartment building;" that by reason of the changes in the neighborhood the restriction against the erection of an apartment building upon appellees' property injures the property and makes it yield less profit or incapable of yielding any profit and is inequitable, and appellees are entitled to have the same removed as a cloud upon their title, and that the Chicago Title and Trust Company had no power to enter into any contract or agreement perpetually restricting the use of the premises.

It is apparent from these findings that the decree is based upon the theories (1) that because of the changes in the nature of the district surrounding the property in question and inability to use the property profitably for private residence purposes the restrictive covenant originally entered into for the benefit of the adjoining property should be abrogated; and (2) that the covenant, in so far as it purported to be in effect after April 3, 1907, was invalid because the Chicago Title and Trust Company had no power to make it. Our opinion is that the decree cannot be sustained upon either theory.

It has been announced as the rule in this State that equity will not enforce a restriction where by the acts of the grantor who imposed it, or of those who derived title under him, the property and that in the vicinity has so changed in its character and environment and in the uses to which it may be put as to make it unfit or unprofitable for use if the restriction be enforced, or where to grant an injunction against violation of such restriction would be a great hardship on the owner and of no benefit to the complainant, or where the complainant has waived or abandoned the restriction. (*Cuneo* v. *Chicago Title and Trust Co.* 337 Ill. 589; *O'Neill* v. *Wolf,* 338 id. 508.) In these two recent cases thorough consideration has been given to the factors involved in applying this general rule. Follow-

ing earlier authorities which are therein analyzed, these two cases make it plain that even though changes have taken place on the street immediately involved, and even though the property from which it is sought to remove the force of the restrictions would be more valuable without than with them, equity cannot, on such ground alone, abrogate restrictions which have been made for the benefit of other property which has not been so changed. As we said in the *Cuneo case:* "While it may be a financial hardship upon appellants to enforce the single-dwelling restrictions on their lots, yet it must be borne in mind that these restrictions were in the deeds which they took to the property and are made for the benefit of all of the lots on Castlewood Terrace. If the character of the property on Castlewood Terrace had by the acts of the owners thereof changed to the extent justifying a court of equity to remove restrictions that court should not hesitate to do so, but the fact of change in the neighborhood of the property on Castlewood Terrace does not, alone, warrant a court of equity in relieving the property of appellants here from the restrictions imposed."

It may be granted that the chancellor was warranted in finding that the "district" in general, as above described, can no longer be classed as a private residential neighborhood and that some degree of financial hardship will result to appellees unless the restriction complained of be removed, but consideration must also be given to the fact that, according to the map introduced in evidence, on the east side of Greenwood avenue, between the houses belonging to appellant and Moore and the apartment building at the northeast corner of Greenwood avenue and East Forty-sixth street, there is a row of thirteen residences of substantial stone and brick construction; that according to the map, on the west side of Greenwood avenue between East Forty-fifth and East Forty-sixth streets there are ten residences, most of them on 60-foot lots and most of which appear from photographs in evidence to be large and sub-

stantially constructed; that, as found by the chancellor, since the erection of the houses belonging to Moore and appellant no buildings have been erected on either side of Greenwood avenue between East Forty-fifth and East Forty-sixth streets with the exception of the apartment building located at the northeast corner of Greenwood avenue and East Forty-sixth street, erected about twenty-three years ago, and that, consequently, Greenwood avenue in the block in which appellant's property lies bears the same distinctive earmarks of a private residential street which characterized it at the time the restriction in question was created. Appellant and the other defendants have done nothing to make it any the less such a street, not even to the extent of taking in roomers. To be sure, the evidence shows that within the past three years houses have been torn down on the east side of Greenwood avenue between East Forty-fifth and East Forty-fourth streets and that apartment buildings containing 139 apartments have been erected thereon, one of them being at the northeast corner of Greenwood avenue and East Forty-fifth street; that a building containing thirty apartments has been erected east of this latter building on East Forty-fifth street, and that the residence on the northwest corner of Greenwood and East Forty-fifth street is being remodeled for apartments. It is significant, however, that the chancellor did not find either that the restriction which it is sought to destroy is no longer a benefit to the properties of appellant and Moore or that the erection of apartments upon the 40½ feet would not appreciably injure or damage their property for residence purposes. Such findings would not have been warranted. There is testimony that substantial financial damage would result to appellant from the building of an apartment on the 40½ feet. East Forty-fifth street is shown to be 66 feet in width. From appellant's standpoint it is one thing for apartments to be in a block lying on the other side of that street but it would be an entirely different thing for apartments to be on the

40½ feet immediately adjoining her premises. Leaving out of consideration the possible effect of an apartment building on her light and air, the added noise and interference with privacy resulting from the congestion of families, which is the ordinary concomitant of such structures, would obviously result in seriously impairing enjoyment of her property as a private residence. Where the restriction involved still remains of such substantial advantage to the property which it was created to protect as does the one here, where the changes invoked are not shown to have affected said property more vitally than they apparently have in the present case, a court of chancery cannot undertake to wipe out duly recorded covenants solemnly entered into for the protection of property rights and in reliance upon which such rights have been acquired.

The theory upon which is based the contention that the Chicago Title and Trust Company had no power to prevent the erection of an apartment building on the premises in question after April 3, 1907, is that the deed by the Trainers contained an express provision forbidding the erection of any apartment building, or any building or improvements except three detached dwelling houses, on the premises thereby conveyed, on or before April 3, 1907; that this being an express provision dealing with the right to erect apartment buildings on the premises described, it controls the general grant of authority thereafter set forth, and that under the maxim *expressio unius est exclusio alterius* it must be held to be the only provision in the deed covering the right to restrict the nature of the improvements upon the premises. The maxim thus invoked expresses a rule of construction—not of substantive law. (*United States* v. *Barnes,* 222 U. S. 513.) As this court said in *Public Utilities Com.* v. *Monarch Refrigerating Co.* 267 Ill. 528, it "should never be followed to the extent of overriding a different intent clearly expressed." It must be borne in mind that the deed by which Trainer acquired

lots 2 and 3 from Kimball contained the specific restrictions in question. They are repeated, before the *habendum* clause, in the Trainers' deed to the Chicago Title and Trust Company. Following the *habendum* clause appears the language which grants full power and authority "to improve, * * * to contract to sell, to sell on any terms, to convey either with or without consideration, * * * to grant easements or charges of any kind * * * and to deal with said property and every part thereof in all other ways and for such other considerations as it would be lawful for any person owning the same to deal with the same, whether similar to or different from the ways above specified, at any time or times hereinafter, and before the end of twenty-one years from the date hereof." The language employed vests in the trust company sweeping power to deal with and dispose of the property, and under the circumstances disclosed we see no occasion for bringing in and endeavoring to apply a maxim which would detract from the grant of a power so clearly expressed and so unmistakably conferred.

It is further contended, however, that the Chicago Title and Trust Company had no power to create restrictions against the property which would extend beyond the period of the trust. Counsel for appellees state that an examination of the authorities fails to disclose any case in which the facts were similar to those in the case at bar, but argue that an analogy is found in certain cases which hold that a trustee has no right to execute leases extending beyond the period of the trust. *Bergengren* v. *Aldrich*, 139 Mass. 256, 29 N. E. 667, and *Gomez* v. *Gomez*, 147 N. Y. 195, 41 N. E. 421, are cited in this connection. In those cases it was held that no power was disclosed to authorize trustees to renew leases after the period of the trust or to bind remaindermen to renew leases executed during the period of the trust. On the other hand, it was held in *Greason* v. *Keteltas*, 17 N. Y. 491, that a trustee holding a legal fee, determinable when the purposes of the trust should cease, has power at

law to lease for a term which may extend beyond the period of his trust estate. That something more than a power to sell may be required before courts will undertake to find the right to lease for a period even within the term of a trust is evidenced by *Evans* v. *Jackson,* 8 Sim. 217, where Vice-chancellor Shadwell said: "The will contains, on the face of it, an express trust that the executors shall sell the house, and, *prima facie,* that is inconsistent with granting a lease." The extent of the power must necessarily be determined in the light of the instrument from which it springs. We find nothing in the cases cited, differing as they do in both nature of power granted and issue presented, to call for the conclusion that the restriction drawn into question was not in order under the comprehensive grant which was here made.

Appellant contends that the chancellor erred in taxing certain costs against her and the other defendants. There was a stipulation that each side would pay for writing up its own testimony. Stenographer's charges paid by appellees were $225.48 and by appellant and the other defendants $60. When the master's report was completed each side paid to the master the statutory fees for the testimony and documentary exhibits offered by each side, amounting to $184.50 by appellees and $124.50 by appellant and the other defendants. The chancellor found that equitably such charges should be paid by the parties that had theretofore paid the same and that no amount of the statutory fees and stenographer's fees should be taxed as costs. The further fee of the master was fixed at $425, and appellant and the other defendants were ordered to pay half of this. In chancery suits the question of costs rests largely in the discretion of the trial judge. While this is a judicial discretion, reviewable by the courts of appellate jurisdiction if it is abused, ordinarily the conclusions of the trial judge are accepted as final. (*Leigh* v. *National Hollow Brake-Beam Co.* 224 Ill. 76.) We are unable to say that the chan-

cellor abused his discretion here, and the award of costs thus made will not be disturbed. In all other respects, however, the decree must be reversed, and the cause is remanded with directions to dismiss the bill for want of equity.

Per Curiam: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.
*Reversed and remanded, with directions.*