TONES INCORPORATED, Plaintiff-Appellee, v. LA SALLE NATIONAL BANK OF CHICAGO, Trustee, et al., Defendants-Appellants.

(No. 74-51;

Second District (1st Division)—December 18, 1975.

Herrick, McNeill, McElroy & Peregrine, of Chicago, and Richard W. Husted, of Elgin, for appellants.

Thomas R. Puklin, of Elgin, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff corporation (hereinafter *Tones*), the owner of Lot 8 in Block 1 in the 1st Addition to Unit 8 of Golf View Highlands in the Village of Carpentersville, sought a declaratory judgment to nullify a covenant which restricted the use of its property to residential and farming purposes. The restriction had been placed on 12 lots in Block 1 among the total of 88 lots in the subdivision by the defendant La Salle National Bank of Chicago, Trustee under Trust No. 14832, the subdivider and original grantor (hereinafter *Besinger*). All owners of the other 87 lots in the subdivision were made parties defendant. Certain defendants filed a counterclaim also seeking to nullify the restriction as to their respective lots (hereinafter *Abramson,* as the owner of Lots 9 and 10 in Block 1, and *Herod,* as the owner of Lots 17 through 20, inclusive, in Block 1).

The trial court declared the restrictive covenant void as to plaintiff's Lot 8 and also as to counterplaintiff Abramson's Lots 9 and 10, but not as to counterplaintiff Herod's lots.

The defendant Besinger and certain of the defendants whose lots are in the subdivision, but not all in Block 1, appeal. They contend that the court's finding that the restrictive covenant was no longer binding on Lots 8, 9 and 10 by reason of alleged changed conditions of the surrounding property is not supported by the evidence. For convenience a sketch of the subdivision is attached as Exhibit A.

EXHIBIT A

The subdivision plat was approved April 4, 1956, by the Village of Carpentersville. The restrictive covenant, placed on Lots 8, 9, 10, and 12 through 20, inclusive, in Block 1, was recorded by Besinger on December 27, 1960. Tones bought Lot 8 in 1969 for $17,000.

At the time the restrictive covenant was imposed, Besinger no longer owned Lots 3, 7, and 11 in the block, but he retained and still retains title to Lots 1, 2, and 12 through 16, inclusive. There is no evidence as to the ownership of Lots 4, 5, and 6 on December 27, 1960, or at present.

Although the record is not entirely satisfactory, there is evidence that at the time the restrictive covenant was put on the other lots, no restriction was placed on Lots 1 and 2 because Besinger planned to use them for commercial purposes in connection with the Meadowdale Shopping Center across the road to the north which he had also developed. Lots 3, 7, and 11 had been sold for residential use prior to the restriction, and a residence had been constructed on each lot. However, the house on Lot 3 was being used as a shoe repair store prior to imposition of the covenant, and the house on Lot 7 may have been used for the sale of insurance. Also prior to the restriction, Lots 4, 5, and 6 were vacant. Besinger testified that he believed those lots were included in the restriction, but they were omitted from the recorded document.

After the restrictive covenant was imposed in December of 1960, Abramson, as owner of Lot 11, and the owner of Lot 7 secured a change from residential to commercial zoning for their lots. Abramson converted his home on Lot 11 to a business use in 1961 or 1962 and purchased Lots 9 and 10 in 1962, claiming to be unaware of the restrictive covenants on those lots. The building on Lot 7 was also converted to a business use and now houses a real estate office and other offices. In 1972 Abramson erected a two-story office building on Lot 11 in place of the converted residence. It also fairly appears from the record that the Meadowdale Shopping Center to the north became fully developed after the date of the restrictive covenants in Block 1. Homes have been built in Blocks 3 and 4 to the west of Block 1.

The traffic along Route 25 beside the 20 lots in Block 1 had apparently increased from a daily average of 6,300 vehicles in 1960 to 19,600 vehicles in 1969 and to 25,700 vehicles in 1972. There was also testimony that traffic had increased substantially on Ravine Lane which separated Block 1 from the remainder of the subdivision to the west.

At the time of trial there was a McDonald's restaurant on Lots 1 and 2 in Block 1 facing Meadowdale Shopping Center to the north; Block 6 to the west of Lots 1 and 2 in Block 1 had been developed by Besinger with a tire shop and a car wash, also facing north toward the shopping center; a church had been constructed in Block 2 west of Lot 11; a school

had been built in Block 7 across the street from Lots 4 through 8; and a tavern and pizza parlor was located on Lot 3 in place of the shoe repair shop. Whether these uses preceded or followed the imposition of the restrictive covenant is not clear in the record. The most that can be said is that the development of Block 6 occurred after the construction of the McDonald's and that most of the buildings described were in existence in 1962. In addition, Route 25 was a four lane highway, having been widened from two to four lanes close to the time of the imposition of the covenants, but the date of the widening was not definitely established.

The evidence indicated that the Village Board of Carpentersville had amended its zoning ordinance in 1970 to change the zoning for Lots 8, 9, and 10 and Lots 17 through 20 from residential to business, subject, however, to private restrictions. However, the comprehensive plan for the Village of Carpentersville, adopted in 1973 just prior to trial, indicated that the area in question should be developed for medium density residential use.

Depending on the witness, the value of vacant lots in Block 1 ranged from $2,500 to $8,000 per lot for single-family use, from $15,000 to $20,000 per lot for apartment building purposes, and from $45,000 to $70,000 per lot for commercial purposes.

Mr. Besinger testified that his purpose in restricting Lots 8 through 10 and 12 through 20 was to protect the property owners and future property owners to the west in the subdivision, that he had permitted the erection of a car wash and tire shop in Block 6 and a McDonald's on Lots 1 and 2 because he no longer had any residential property to the west of those locations, and that he had consistently refused to lift the restrictions even when he controlled most of the lots in Block 1.

In granting the relief sought as to Lots 8, 9, and 10, the trial judge concluded that the restrictions were no longer binding by reason of the changed conditions of surrounding property. He concluded from his view of the property in question that the property to the north of the existing office building on Lot 11 was not suitable for residential purposes. However, he found that there was a distinct difference between that property and the lots lying to the south of the office building on Lot 11 and that there had not been such a change in the kind of usage for lots south of Lot 11 to warrant the lifting of the restriction as to Lots 17 through 20.

The defendants contend that the evidence of changed conditions is insufficient to make the covenant unenforceable and particularly that there is no basis for finding the covenant invalid for certain lots in the block but valid as to others. Tones and Abramson maintain that conditions have clearly changed and moreover that Besinger should not be

permitted to defend the restriction because he has allowed commercial development of land in the subdivision not subject to the restriction.

■■ There are competing themes of thought which must be reconciled in ruling upon the enforceability of covenants which restrict the use of land. An accommodation is required between the policy that an owner of land may not unduly impair the use which a purchaser may make of the land and that which permits an owner, within proper bounds, to define and restrict a use which he considers injurious so long as his intention is made clear. (See, *e.g., Hartman v. Wells,* 257 Ill. 167, 173-174 (1912), and *Hutchinson v. Ulrich,* 145 Ill. 336, 342 (1893).) The standards for accommodating these competing policies when enforcement of restrictions is sought in equity were enunciated in *Ewertsen v. Gerstenberg,* 186 Ill. 344, 349-50 (1900), as follows:

> "Equity will not, as a rule, enforce a restriction, where, by the acts of the grantor who imposed it or of those who derived title under him, the property, and that in the vicinage, has so changed in its character and environment and in the uses to which it may be put as to make it unfit or unprofitable for use if the restriction be enforced, or where to grant the relief would be a great hardship on the owner and of no benefit to the complainant, or where the complainant has waived or abandoned the restriction,—or, in short, it may be said that where, from all of the evidence, it appears that it would be against equity to enforce the restriction by injunction relief will be denied, and the party seeking its enforcement will be left to whatever remedy he may have at law."

■■ Essentially the same standards are applicable when a property owner by affirmative action to quiet title or for a declaratory judgment has sought to cancel or modify a restrictive covenant. *Cuneo v. Chicago Title & Trust Co.,* 337 Ill. 589, 595 (1929); *Drexel State Bank v. O'Donnell,* 344 Ill. 173, 180-181 (1931).[1]

The restriction will not be terminated solely on proof that there has been a change in the character of the neighborhood which makes a particular property more valuable if the restriction is removed without proof that the object of the restriction can no longer be accomplished by its enforcement and that therefore its removal will not unjustly injure other property. *Punzak v. DeLano,* 11 Ill.2d 117, 120-22 (1957); *Cuneo v. Chicago Title & Trust Co.,* 337 Ill. 589, 600 (1929); *Drexel State Bank v.*

---

[1] From an analysis of the results of collected cases in other jurisdictions it appears that somewhat stronger proof has been required to obtain affirmative relief than is required in preventing injunctive relief. This is apparently based on the rationale that the denial of injunctive relief, unlike a decree cancelling the restriction, permits enforcement of the restriction at a later date if conditions change to make its enforcement equitable. See Annot., 4 A.L.R.2d 1111-16 (1949).

*O'Donnell,* 344 Ill. 173, 180-81 (1931). See also *Burden v. Lobdell,* 93 Ill.App.2d 476, 481-82 (1968).

It is also true that the party seeking enforcement must conform to equitable principles. Therefore the restrictions will not be enforced if the one seeking enforcement has waived or abandoned the restriction or has acquiesced in its waiver or abandonment by others. See *McGovern v. Brown,* 317 Ill. 73 (1925); *Kneip v. Schroeder,* 255 Ill. 621 (1912); *Curtis v. Rubin,* 244 Ill. 88 (1910).

The burden of proving that there has been a change in circumstances affecting the validity of the restriction so that the object of the restriction can no longer be accomplished and therefore may be removed without unjustly injuring neighboring properties is on the party who seeks relief from the enforcement of the restriction. *Punzak v. DeLano,* 11 Ill. 2d 117, 121 (1957).

On the record before us it is difficult to find the chronology of the neighborhood uses which the plaintiffs have claimed as changed circumstances subsequent to the imposition of the covenant. The only fact which is clearly proved is that the commercial office building on Lot 11, which was not subject to the restrictive covenant, was constructed after the covenant went into effect. In addition, it appears that some buildings were constructed within the confines of the already established shopping center. The commercial uses on Lots 3 and 7 appear to have preceded the covenant. The dates of the commercial development of Lots 1 and 2 in Block 1 and of Block 6 were not clearly established nor is it clear when Route 25 was widened to four lanes. The traffic increase on Route 25 may be directly attributable to the widening and may have been contemplated at the time the restrictions were imposed.

■■ Therefore we must conclude that the record does not support the finding that the change in the neighborhood conditions subsequent to the recording of the restrictive covenant is sufficient to warrant the removal of the restriction as to any of the lots affected by it.

Additionally, we cannot conclude from this record that the objective of the restriction may no longer be accomplished, that its removal may not cause injury to the other property owners in the subdivision, or that its continuance is unreasonable and oppressive. Besinger testified that the purpose of imposing the restriction in 1960 was to prevent a further encroachment of commercial uses on Route 25 which he felt could adversely affect the primarily residential nature of the subdivision. Based on the only clear proof, this objective could still be obtained at the time the restrictions were challenged by the plaintiffs. And the proof is insufficient to clearly show that the removal of the restrictions on Lots 8 through 10 would not adversely affect the residential property for whose benefit the restriction was intended.

In fact it is quite clear from the record that the commercial development of Lots 12 through 20 in Block 1 would have an adverse affect on the residential property west of the lots in the subdivision. Moreover, the fact that the defendants, some of whom are property owners of lots in Block 1 whose property is also burdened by the restriction, have resisted the suit to lift it on Lots 8 through 10 is evidence that the removal would cause substantial injury to them. See *Paschen v. Pashkow,* 63 Ill.App.2d 56, 68 (1965).

Nor does the proof establish that the plaintiffs will suffer substantial hardship if the restriction is binding as to their properties. The fact that the property is worth more to them for commercial purposes is not decisive. (*Cuneo v. Chicago Title & Trust Co.,* 337 Ill. 589, 598 (1929).) Obviously the property is not suitable for farming purposes nor possibly single-family residential, but there is nothing to indicate that it is not suitable for multiple family or other residential use, particularly since any construction may face Ravine Lane, an interior street.

There is no evidence in the record to show that the defendants either abandoned or acquiesced in the violation of the restrictive covenant. The plaintiffs may not support this argument by the commercialization which occurred prior to the imposition of the restrictive covenant which was ostensibly to stop further commercialization or by reference to subsequent commercialization of properties in Block 1 which Besinger did not own or control at the time the restricted covenant was imposed.

The plaintiff and counterplaintiffs as the owners of Lots 8, 9, and 10 in Block 1 purchased the property with knowledge of the restrictive covenant and in the absence of proof of substantially changed conditions are precluded from invalidating a restriction which has not been shown to lack benefit to the owners who seek to enforce it.

Of course, nothing in this opinion is intended to preclude the parties from showing in another proceeding that there have been changes in the neighborhood or conduct occurring after the decree in this case was entered which would make enforcement of the restriction inequitable. See *Dolan v. Brown,* 338 Ill. 412, 413 (1930); *Gordon v. Caldwell,* 235 Ill.App. 170, 179 (1924); *Ockenga v. Alken,* 314 Ill.App. 389, 397 (1942).

In the view that we have taken the remaining contentions of the parties do not become material.

We therefore hold that the restrictive covenant limiting the use of Lots 8, 9, and 10 to residential and farming purposes was enforceable in equity as of October 1, 1973. The judgment of the trial court is reversed.

Reversed.

GUILD and HALLETT, JJ., concur.