FIRST DIVISION

December 3, 2001

No. 1-00-3369

WILLIAM VANDELOGT, ) Appeal from the 

 ) Circuit Court of 

Plaintiff-Appellee, ) Cook County

 )

v. ) No. 99 CH 1669

 ) 

MICHAEL BRACH AND SUSAN BRACH,) The Honorable

) Dorothy Kinnaird,

Defendants-Appellants. ) Judge Presiding.

OPINION MODIFIED UPON DENIAL OF REHEARING

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff-appellee William VandeLogt filed a complaint for a permanent injunction against defendants-appellants, Michael and Susan Brach, alleging that defendants were violating a protective covenant in their subdivision plat by building a second level to their garage resulting in more than a two-car garage capacity.  The permanent injunction was granted.  Defendants now appeal the trial court's order.  The issues presented for review are whether the trial court erred by:  (1) granting a permanent injunction requiring defendants to modify their garage to provide no more than a two-car base dimension and a second floor with only a standard storage area; and (2) finding that waiver and acquiescence were not proved.

BACKGROUND

In August 1998, defendants began building a detached garage on their property in the Sunny Mead Acres subdivision (Sunny Mead) of Inverness, Illinois (the Village).  Sunny Mead consists of 48 lots, each consisting of approximately one acre of land.  Defendants' garage is 32 feet by 23 feet in dimension, totaling 736 square feet.  Defendants' property is immediately adjacent to the southernmost region of plaintiff's property.  

Defendants applied for various building permits relative to the expansion of their garage, which included a second floor, in January 1998.  Following defendants' building permit application, Michael Brach signed an acknowledgment submitted to him by the Village.  It reads, in pertinent part, as follows:   

   "The undersigned, having applied to the Village of Inverness for a building permit, acknowledges:

   (1) That there might be private covenants, conditions and restrictions running with the title to the property which is the subject of the permit applications which regulate, govern, control, and/or affect what type of improvements may be made on the subject property; 

   (2) That the Village, by issuance of a building permit has no power to and does not abrogate, vary, terminate, waive, or release any such covenants, conditions, and restrictions of record which may be applicable to the subject property; 

   (3) that the undersigned remains obligated to comply with such covenants, conditions, and restrictions of record notwithstanding the fact that they have received a building permit from the Village of Inverness."

Restrictive covenant number 1 of the protective covenants of Sunny Mead Acres, dated April 28, 1948, provides, in pertinent part:  

   "No building shall be erected or permitted on any part of the premises except 
one single family dwelling and private garage of not more than two-car capacity appurtenant thereto on any Lot." 

In a letter dated March 5, 1998, the Village inquired as to the intended use for the second level of the Brachs' garage.  In a letter dated March 9, 1998, the Brachs replied, "[T]he primary use of the area above the garage will be for storage and possibly a game room in the future."  The Brachs were granted the building permit in May 1998.  The parties stipulate that in or about July 1998, Michael Brach told plaintiff that he intended to build an unattached garage on his property. Around September 1, 1998, plaintiff noticed that the foundation of the Brach garage was going to exceed what he would consider a capacity for two cars.  

In a letter dated October 16, 1998, plaintiff's counsel advised defendants that plaintiff intended to file suit to enforce the restrictive covenants of Sunny Mead if construction continued.  Defendants halted further construction of the garage.   Plaintiff's complaint for a permanent injunction presented the following allegations, in pertinent part:

   "6. In or around July of 1998, the Defendant, MICHAEL BRACH, during a conversation with Plaintiff, WILLIAM VANDELOGT, represented to Plaintiff that he intended to build an unattached garage on his property and that said structure was being built in compliance with the covenants and restrictions of the subdivision of Sunny Mead.

   7. On or about Mid-August, 1998, Defendants began construction of a structure that appeared to be larger than a two-car garage[;] however[,] Plaintiff relied on Defendants' representations that the structure would comply with the covenants and restrictions of Sunny Mead Acres. 

   8. It is now apparent that the structure has taken the form of a three-car garage in violation of said Plat of Subdivision. ***

   9. On or about October 16, 1998, Plaintiff sent correspondence to Defendants expressing his objection to said violation. *** Defendants have since halted further construction on the subject garage.

* * *

   13. *** Plaintiff will be damaged in that the over-sized structure will limit his view of the surrounding nature.

   14. The Plaintiff will be irreparably damaged if equitable relief is not granted as requested.

   15. The Plaintiff has no adequate remedy at law available that would provide the appropriate recovery." 

In defendants' answer, defendants admitted that Michael Brach had a conversation with plaintiff around July 1998, but denied plaintiff's representation of that conversation.  Defendants also admitted to "beginning construction of a garage having larger than a 2 car capacity about mid-August, 1998."  Further, defendants presented three affirmative defenses:  unclean hands, waiver, and acquiescence.  Defendants asserted that on or about October 29, 1998, and prior thereto, plaintiff "was aware that approximately 40% + of the homes in the Sunny Mead Acres Subdivision had garages with more than a two car capacity."

In plaintiff's amended response to defendants' request to admit facts, plaintiff admitted that "two houses in the Sunny Mead Acres Subdivision have four-car capacity garages *** and no houses on Williams Road, other than Defendants' home, have garages exceeding two-car capacity and that no garage exceeding two-car capacity is visible from Plaintiff's residence."  Further, plaintiff admitted that "seven houses in the Sunny Mead Acres Subdivision have garages with a capacity exceeding two cars."

Defendants filed a motion for summary judgment alleging that plaintiff "acquiesced in the violation of the restrictive covenant by failing to enforce the same as to other violators, and has thereby waived his right to enforce the restriction against Defendants."  Defendants' affirmative defense of unclean hands was not pursued in the motion for summary judgment.  Plaintiff responded to the motion for summary judgment, asserting that an issue of fact remained as to whether plaintiff was "forever barred from asserting an action against his neighbor for violation of a covenant and restriction based on acquiescence when seven houses *** contain garages exceeding the two-car capacity restriction."  Defendants' motion for summary judgment was denied. 

At trial, Michael Brach was called by plaintiff as an adverse witness.  He testified that the original plans for the garage included insulation drywall on the second floor and a double outward opening door.  In addition to the drywall and double doors, the plan for the garage included electrical outlets, four-foot by five-foot windows, and a deck on the south side of the second floor.  Michael testified that he applied for and was granted a building permit.  Pursuant to the grant of the building permit, Michael signed a document acknowledging that there may be covenants and restrictions running with the property.  He testified:  "I viewed it as a release of liability to cover the Village as far as if somebody did have a problem with whatever you were doing or whatever."  He also testified that he became aware that there was a covenant and restriction with regard to the car capacity of his garage when he received a letter dated October 16, 1998, from plaintiff's attorney. 

Upon cross-examination, Michael testified that the double doors were installed so that large objects could be brought in and stored on the second floor.  He stated that he did not intend to occupy the second level and that it would not be used as a separate residence.  When the Village inquired as to the purpose of the space, the Brachs responded that it would be used primarily for storage, but at some point in the future, it may become a game room for the Brach children.  Michael Brach also  testified that he sought advice from an unidentified attorney to look into whether he could build a detached garage.  He received word that he could.  The attorney did not otherwise review any possible covenants or restrictions with the Brachs.

Plaintiff testified at trial that there are no garages on his block that exceed a two-car capacity.  He also testified that no garages that exceed two-car capacity can be viewed from his home.  He stated that, of the seven houses in Sunny Mead that have garages that exceed a two-car capacity, "Maybe, two of them might have some rooms over the garage which are rooms as part of their house.  I meant garages are [
sic
] attached."  Relative to the unattached garages in Sunny Mead, plaintiff was not aware of any that had a second floor.  Plaintiff recalled that defendants began building their garage in late July 1998.  He testified that he told Mr. Brach that his garage had to be attached to his home because that is what a neighbor told him 40 years ago.  Later, plaintiff discovered that an attached garage was not a requirement.  Plaintiff denied that his reason for telling Mr. Brach that the garage had to be attached was because it blocked his view of the retention pond.  In September 1998, plaintiff told Mr. Brach that building the garage in that location "was a lousy thing to do."  Although plaintiff never saw anyone living on the second floor, he believed it to be a second-floor living space.  When the plaintiff's attorney sent the letter dated October 16, 1998, the garage was approximately two-thirds complete.  Plaintiff was asked, "What is a two-car capacity garage?"  He responded, "In my estimation it's a garage that will not hold three cars."

Susan Brach testified that she prepared a binder of materials for this case which included the names of all property owners in Sunny Mead and the measurements of their garages.  Some of the garages were measured by the Brachs, while the dimensions of the others were supplied by the owners.  Susan Brach testified that in terms of square footage, there are 10 garages larger than her current garage.  However, none of them include a second floor.  Mrs. Brach testified that plaintiff's northern neighbor, lot 46, has "a two-car garage attached to the home and then they have a single car garage unattached toward the back of the home." To her knowledge, the Sunny Mead covenants do not bar homeowners from having a second story on their garage.  

In making its decision, the trial court noted that it did not believe Michael Brach's testimony that he understood the signed acknowledgment to be "a release of liability" for the Village.  The court also did not believe that Mr. Brach did not become aware of the restrictive covenants until he received the October 16, 1998, letter from plaintiff's counsel.  The court also stated that the binder prepared by Susan Brach was "somewhat misleading."  It was difficult to see either the house or the garage in some of the photos.  Moreover, the court found it important that the Brach garage is the only "unattached three-car garage with full second floor" and that there are only two other completely unattached three-car garages in the entire subdivision (lots 13 and 29-30).  The court stated that most of the garages that have been labeled as four-car garages are in actuality two two-car garages or a two-car garage and a one-car garage.

Based upon the Brachs' response to the Village's inquiry and Michael Brach's testimony, the court held that, "What was erected in this case was much more than a garage.  It is a garage which is really an annex to the home. *** I believe that this garage must be altered."  Relative to acquiescence and waiver, the court stated that "Plaintiff has a right to enforce the covenant and he did not sit on his rights."  Plaintiff's motion for a permanent injunction was granted.  

The trial court's order directed defendants to make the necessary modifications to the garage "so that it is in compliance with the covenants and restrictions of Sunny Mead Acres Subdivision."  The order also required that the modified garage not exceed a two-car capacity base floor and allow only for a standard storage area above the garage.

ANALYSIS

I

Defendants contend that the trial court erred in granting a permanent injunction requiring them to modify their garage to provide no more than a two-car base dimension and a second floor with only a standard storage area.  Plaintiff responds that the trial court's construction of the restriction was "correct as a matter of law."

Restrictive covenants are to be strictly construed and will be enforced only if they are reasonable, clear and definite.  
400 Condominium Ass'n v. Gedo
, 183 Ill. App. 3d 582, 584, 539 N.E.3d 256 (1989).  A covenant should be interpreted to give effect to the actual intent of the parties at the time the covenant was made.  
Streams Sports Club, Ltd. v. Richmond
, 99 Ill. 2d 182, 188, 457 N.E.2d 1226 (1983).  The intent of the parties can best be determined by express contractual provisions.  
Streams Sports Club
, 99 Ill. 2d at 188. 

The covenant at issue here states, in pertinent part:  "No building shall be erected or permitted on any part of the premises except 
one single family dwelling
 and private garage of 
not more than two-car capacity
 appurtenant thereto on any Lot." (Emphasis added.)  Defendants admitted in their answer to plaintiff's complaint that they began "construction of a garage having larger than a 2 car capacity about mid-August, 1998."  The photos of defendants' garage show that defendants' garage exceeds a two-car capacity.  The trial court found that the Brachs' garage was the only "unattached three-car garage with a full second floor" in Sunny Mead.

Defendants assert that there is no evidence "other than sheer speculation by the trial court" that the second floor of the garage was being used for living space.  When asked whether the original plans included an outward opening door that would be practically used with a deck on the second floor, Michael Brach responded:  "Yes, it did.  I think the plans specify that that was a future addition, but we are going to put one on there."  When asked whether the original plans stated that the second floor of the garage was for storage and a future playroom, Brach responded:  "We did not designate what it was when we submitted the plans.  The Village didn't request additional information on that and that is what we indicated to them and that was our original intention."  Later, Mr. Brach testified that he did not intend to occupy the second floor of the garage as living space and that the deck was an entrance way.  Based on the evidence presented, including Michael Brach's testimony and the letter written by him in response to the Village's inquiries, the trial court concluded that the second level of the garage was intended to be used as an extension of the home.  The trial court stated, "The purpose of the subdivision restriction was to keep single-family dwellings with two-car garages" and the "plaintiff has a right to enforce the covenant."  The trial court did not err. Defendants contend that the meaning of the words "not more than two-car capacity" in the restrictive covenant are "ambiguous."  However, in its decision the trial court stated "[a] two-car garage is a garage that has a two-car capacity, two standard vehicles, or in this day and age even two standard sports utility vehicles.  Defendants know what a two-car garage is.  Any garage in which you can't fit a third car."  The trial court did not misconstrue the restrictive covenant.    

As to the second floor, the trial court stated, "So to preclude another motion coming back in, it does not mean the entire of everything from where the entire roof and everything has to be immediately above the cars.  There can be a storage area above the garage, but not a full second-story living space, not a place which is a game room, a club house, a second place to put the kids, or an au pair or whatever could be done with that.  We are talking common sense."  Again, regarding the second story, the trial court did not misconstrue the restrictive covenant.  

II

Defendants assert that "waiver and acquiescence were proved by Defendants' significant, uncontradicted, and compelling evidence."  Plaintiff responds that the trial court's finding that waiver and acquiescence were not proved was not against the manifest weight of the evidence. 

Waiver has been described as an intentional relinquishment of a known right.  
Sexton v. Smith
, 112 Ill. 2d 187, 193, 492 N.E.2d 1284 (1986).  Where there has been acquiescence in prior violations of a particular restriction, the plaintiff's acquiescence will result in the waiver of any right to enforce the restriction.  
Watts v. Fritz
, 29 Ill. 2d 517, 523, 194 N.E.2d 276 (1963).  Restrictive covenants will not be enforced when property owners have acquiesced in prior violations of the covenants.  
City of Rolling Meadows v. National Advertising Co.
, 228 Ill. App. 3d 737, 747, 593 N.E.2d 551 (1991).  However, minor violations do not prohibit subsequent enforcement of the covenant.  
Rolling Meadows
, 228 Ill. App. 3d at 747.  In determining the extent of prior violations, separate and distinct restrictions that have been violated will not amount to acquiescence of the violation currently at issue.  
Pettey v. First National Bank of Geneva
, 225 Ill. App. 3d 539, 549, 588 N.E.2d 412 (
1992).  Moreover, the trial judge's findings will not be disturbed on review unless they were against the manifest weight of the evidence.  
Rolling Meadows
, 228 Ill. App. 3d at 747.

Relative to waiver and acquiescence, the trial court held that "plaintiff's forbearance from filing a cause of action against any other property owner in the Sunny Mead subdivision did not constitute acquiescence on the part of the plaintiff barring the claim."  The trial court considered the proximities and locations of other properties relative to the plaintiff's lot.  Lot 9 contains a single-family dwelling with two two-car garages and is located on Haman Road.  The trial court commented, "[N]obody could expect someone to start suing every neighbor in the whole area on property that was so far away from them."  Defendants' garage could be seen from plaintiff's property.  When plaintiff became aware that the defendants' garage would exceed two-car capacity, which was prior to completion, he attempted to halt construction. 

Plaintiff cites to 
Paquette v. Coble
, 271 Ill. App. 3d 1110, 653 N.E.2d 1262 (1995), to illustrate what constitutes waiver and acquiescence of prior violations of a restrictive covenant that will result in a waiver of any right to enforce that restriction.  The 
Paquette
 case discusses the "change of neighborhood" and waiver defenses to a permanent injunction.  
In 
Paquette
, a subdivision was platted in 1954 and, subsequently, a rider was recorded governing lots 2 through 5 permitting no more than one single-family residence to be built on any parcel of the premises having an area of less than 2 1/4 acres.  Plaintiffs, owners of lot 2, wished to subdivide the lot, which had an area of approximately 2.07 acres.  Defendants owned the other three lots.  Defendants claimed that the restrictive covenant prohibited subdivision.  Plaintiff filed a declaratory judgment action alleging, 
inter
 
alia
, that:  (1) any prohibition of subdivision was waived as a result of the subdivision of lot 3 by deed and (2) the restrictive covenant was unenforceable due to the changed condition of the area.  
Paquette
, 271 Ill. App. 3d at 1111-12.  The defendants argued that the subdivision of lot 3 and the building of homes on the resulting two lots did not change the character of the area and, thereby, did not render the restrictive covenant unenforceable.  
Paquette
, 271 Ill. App. 3d at 1112.

The facts established that lot 3 consisted of an area of about 1.84 acres.  In 1970, lot 3 was divided into half to create two lots, each less than one acre.  Each of the resubdivided lots was improved with a single-family residence.  At the closing of the purchase of half of lot 3, the purchaser was told of the covenant.  The owner of lot 5 testified that the building of a home on subdivided lot 2 would destroy the natural wooded beauty of the area.
  

 The trial court entered judgment in favor of the plaintiffs, finding that the subdivision of lot 3 materially changed the area, and, therefore, the restrictive covenant was unenforceable.  
Paquette
, 271 Ill. App. 3d at 1112.  Defendants appealed.

The appellate court affirmed the trial court's decision.  
Paquette
, 271 Ill. App. 3d at 1114.  The appellate court wrote that the restrictive covenant did not expressly prohibit subdivision.  271 Ill. App. 3d at 1114.  It only prohibited building more than one single-family dwelling on an area smaller than 2 1/4 acres.  The appellate court held that the subdivision of one of the other four lots in violation of the restrictive covenant altered the character of the neighborhood so that the purpose of the covenant could not longer be achieved.  
Paquette
, 271 Ill. App. 3d at 1115.  The appellate court wrote, "We also note that defendants' predecessors in title did not enforce the restrictive covenant to prevent the building of homes on lot three.  Acquiescence in prior violations of a particular restriction by a party will result in the party's waiver of any right to enforce the restriction."  
Paquette
, 271 Ill. App. 3d at 1115-16. 

While 
Paquette
 is instructive, its facts are dissimilar to the facts in the instant case.  There, unlike the instant case, the building on the subdivided lots altered the character of the neighborhood so that the purpose of the covenant could no longer be achieved.  There, one-fourth of the area lots subject to the covenant did not conform to the restrictive covenant.  Here, although defendants alleged that plaintiff was aware that "approximately 40% + of the homes in Sunny Mead Acres Subdivision had garages with more than a two car garage capacity," the evidence established that 7 out of 38 garages, or 18.5% of the garages, in Sunny Mead exceed a two-car capacity.  Importantly, also, the record does not establish when the garages were built and which of the structures were built prior to plaintiff moving into Sunny Mead.   

Although not analogous, an even more instructive case is 
Tones Inc. v. LaSalle National Bank of Chicago
, 34 Ill. App. 3d 236, 339 N.E.2d 3 (1975).  In 
Tones
, the plaintiff corporation filed for a declaratory judgment to nullify a covenant which restricted the use of its property, lot 8 in block 1 of the subdivision, to residential and farming purposes.  
Tones
, 34 Ill. App. 3d at 239.  The owner of lots 9 and 10 and the owner of lots 17 though 20, inclusive, in block 1 who were named defendants filed a counterclaim also seeking to nullify the restrictions as to their respective lots.  The restriction had been placed on lots 8, 9, 10 and 12 through 20, inclusive, in block 1 in 1960.  Tones bought lot 8 in 1969.  Lots 3 and 7 were being used by their owners for business purposes prior to the restriction.  Lot 11 was converted to business use in 1962.  A shopping mall to the north was developed after the date of the restrictive covenants in block 1.  There was a McDonald's restaurant on lots 1 and 2 of block 1 at the time of trial.  Homes had been built on block 3 and 4 to the west of block 1.  Various commercial and residential properties had been built in block 6 and 7 located across a highway route from lots 4 through 8 of block 1.  

The trial judge concluded that the restrictions on lots 8, 9, and 10 were no longer binding by reason of the "changed conditions of [the] surrounding property."  
Tones
, 34 Ill. App. 3d at 240.  The trial court reasoned that, while the property to the north of the existing office building on lot 11 was not suitable for residential purposes, there had not been such a change in the kind of usage for lots south of lot 11 to warrant the lifting of the restriction as to lots 17 through 20.  
Tones
, 34 Ill. App. 3d at 240.

The issue before the appellate court in 
Tones
 was whether the evidence of changed conditions was sufficient to make the covenant unenforceable.  The defendant bank contended that the trial court's finding that the restrictive covenant was no longer binding on lots 8, 9, and 10 by reason of alleged changed conditions of the surrounding property was not supported by the evidence.  
Tones
, 34 Ill. App. 3d at 238.  At the time of trial, a tavern and pizza parlor was located on lot 3, a school had been constructed across the street from lots 4 through 8, and a church had been constructed to the west of lot 11.  
Tones
, 34 Ill. App. 3d at 239-40.  It was established that the commercial office building on lot 11, which was not subject to the restrictive covenant, was constructed after the covenant went into effect.  
Tones
, 34 Ill. App. 3d at 242.  The commercial uses on lots 3 and 7 appeared to have preceded the covenant.  
Tones
, 34 Ill. App. 3d at 242.  

The appellate court reversed the trial court and held:  "[T]he record does not support the finding that the change in the neighborhood conditions subsequent to the recording of the restrictive covenant was sufficient to warrant the removal of the restriction as to any of the lots affected by it. *** And the proof is insufficient to clearly show that the removal of the restrictions on Lots 8 through 10 would not adversely affect the residential property for whose benefit the restriction was intended."  
Tones
, 34 Ill. App. 3d at 242.  Additionally, the court wrote, "There is no evidence in the record to show that defendants either abandoned or acquiesced in the violation of the restrictive covenant."  
Tones
, 34 Ill. App. 3d 243.  

The appellate court in 
Tones
 reasoned that the burden of proving that there has been a change in circumstances affecting the validity of the restriction, so that the object of the restriction can no longer be accomplished and therefore may be removed without unjustly injuring neighboring properties, is on the party who seeks relief from the enforcement of the restriction.  
Tones
, 34 Ill. App. 3d at 242. 

In the instant case, the restrictive covenant barred construction of a garage exceeding a two-car capacity.  Also, here, similar to 
Tones
, we hold that there is no evidence in the record to show that plaintiff either abandoned or acquiesced in any violations of the restrictive covenant in Sunny Mead.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

COHEN, P.J., and McNULTY, J., concur.