# Staunton

ERNEST R. BOOKER AND M. E. BOOKER v. OLD DOMINION
LAND COMPANY, A VIRGINIA CORPORATION, ET ALS.

September 8, 1948.

Record No. 3369.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Staples
and Miller, JJ.

*F. Lee Ford* and *S. W. Colonna*, for the appellants.

*Newman & Allaun* and *Taylor & Hall*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

Ernest R. Booker and wife, herein referred to as plaintiffs, filed their petition, or motion, under the Declaratory Judgment Act (Acts, 1922, ch. 517, p. 902; Code, 1942 (Michie), section 6140a *et seq.*), seeking to cancel and annul, and to remove as a cloud on their title, certain building and use restrictions contained in deeds to lots in Parkview, a subdivision made by Old Dominion Land Company.

Notice of the petition was served on Old Dominion Land Company, which filed its answer. An order was entered reciting that the company no longer owned any of the lots, and directing that the Bookers serve notice on all owners in the subdivision within 500 feet of their property and publish a notice of the proceeding in a newspaper. Afterwards, owners of certain of the lots in the subdivision filed their intervening petitions, or answers. At the conclusion of plaintiffs' evidence, which was heard *ore tenus*, defendants moved to strike it out as insufficient and to dismiss the motion. The court later entered its decree denying the relief sought and dismissing the motion.

Much argument is devoted to the alleged error committed by the court "in striking the evidence of the plaintiffs." While that is part of what the defendants asked the court to do, the decree shows that the court, after consideration of the pleadings, evidence, exhibits, and argument, "decreed that the plaintiffs' Notice of Motion be, and the same hereby is dismissed." The procedure, therefore, followed the rule announced in *Kiss* v. *Gale*, 187 Va. 667, 47 S. E. (2d) 353, that a motion to strike the plaintiff's evidence in an equity case (which is the nature of this proceeding, and so stated in an order transferring it to the chancery docket on motion of the plaintiffs) has the effect of submitting the case for decision on its merits on the plaintiff's evidence. The

question for decision now is whether the trial court correctly ruled that the evidence presented was not sufficient to warrant the granting of the relief prayed for.

In 1937, Old Dominion Land Company subdivided about 114 acres of its land, lying north of Newport News, in Warwick county, into lots, named the subdivision Parkview and made a map thereof, which was recorded. There were about 164 of these lots, laid off along and abutting on the east and west sides of what was called Jefferson avenue on the map, and which is now U. S. Highway No. 168. The company thereupon proceeded to sell these lots and at the time of the institution of this suit had sold all of them. Twelve of the lots were marked "business" and a few as "sold" or "reserved," and the rest were for residential purposes. The deeds for residential lots contained identical restrictions, those material here being these:

"1st. That no buildings, other than dwelling houses and the necessary private garages and other outbuildings, shall be erected or permitted on the land hereby conveyed, unless plans for a different design of houses be first approved in writing by the party of the first part. The said dwelling houses shall not cost less than $1,500.00 each; and not more than one such dwelling house shall be permitted on each lot.

\* \* \*

"3rd. That there shall not be manufactured or sold, or caused or permitted to be manufactured or sold, on any portion of said premises, any goods, wares or merchandise of any kind; and there shall not be carried on, or permitted to be carried on, any commercial business or trade whatsoever.

\* \* \*

"6th. The covenants, conditions, agreements and restrictions herein contained shall run with the land and shall be construed as covenants running with the land until the 1st day of January, 1959, when they shall cease and determine."

Plaintiffs are the owners of lots 41 and 42, block 7, in this subdivision, conveyed to them June 13, 1946, by deed

reciting that it was subject to the restrictions, covenants and conditions contained in the original deeds from the Old Dominion Land Company.

The ground alleged by the plaintiffs as entitling them to a cancellation of the restrictions is a change of conditions "so radical as to destroy the essential objective and purposes of the covenants, conditions and restrictions originally contained in the Old Dominion Land Company deeds."

The answer of the Old Dominion Land Company averred that these restrictions were made "not only to promote the sale of the property as shown on the said map but to preserve it for the time specified primarily as a residential section." It prayed that the validity of the restrictions be maintained and construed as covenants running with the land until the 1st day of January, 1959. The owners of several of the lots in the subdivision filed answers or petitions joining in the prayer that the restrictions be cancelled. Others filed petitions or answers opposing it. The latter included Mrs. Hattie E. Fleming, owner of lot 39, block 7, one lot distant from the Booker property, who is the active appellee here. Opposing also was the Parkview Civic League, composed, it asserted, of a large number of property owners in the Parkview subdivision and the subdivision adjacent to it.

The answer of Mrs. Fleming and of some of the other defendants averred that in November, 1946, she had brought suit and had obtained an injunction restraining the defendant in that case from conducting any commercial business or trade on lot 48 in block 7.

Plaintiffs assign as error and argue that the restrictions against commercial use of their property were not reasonable. It has been held to the contrary several times by this court and is generally so held.

In *Renn* v. *Whitehurst*, 181 Va. 360, 365, 25 S. E. (2d) 276, 278, we said: "The judicial trend of the day as well as the legislative inclination is to recognize and uphold the validity of such restrictions as are here present."

*Cf. Schwarzschild* v. *Welborne*, 186 Va. 1052, 45 S. E.

(2d) 152; *Jernigan* v. *Capps*, 187 Va. 73, 45 S. E. (2d) 886.

In *Deitrick* v. *Leadbetter*, 175 Va. 170, 175, 8 S. E. (2d) 276, 278, 127 A. L. R. 849, defendant was enjoined from using her property on Chamberlayne avenue, in Richmond, as a tourist home, as offending against a restriction limiting its use to residential purposes. It was there said: "* * * Whenever land is developed under a general scheme, reasonable restrictive covenants which appear in deeds to all lots sold are enforceable alike by the vendor and by the vendees and by their sucessors in title. * * *."

In that case, as here, it was contended that there had been such a change in local conditions as to make the application of the covenant unnecessary and undesirable, and this was given as a fair statement of the rule to govern the decision of the question (175 Va. 177, 8 S. E. (2d) 279): "* * * 'No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement.' *Rombauer* v. *Compton Heights Christian Church*, 328 Mo. 1, 40 S. W. (2d) 545, 553."

See also, 14 Am. Jur., Covenants, etc., section 305, pp. 648-49; 26 C. J. S., Deeds, section 171, p. 575; *Humphreys* v. *Ibach*, 110 N. J. Eq. 647, 160 A. 531, 85 A. L. R. 980.

On the subject of changed conditions as affecting the enforcement of restrictive covenants, the cases are legion. Many of them are discussed or cited in notes in 54 A. L. R. at p. 812, 85 A. L. R. at p. 985, and 103 A. L. R. at p. 734. The cases, of course, deal with different facts and it is not possible to reconcile many of the holdings on similar facts.

It is generally true, however, that where the restrictive covenant is induced by the then existing conditions and surroundings of the land embraced in the subdivision, and the presumption of its continued availability for the covenanted purposes, if a radical change takes place in the whole neighborhood so as to defeat the purpose of the restrictions and render their enforcement inequitable and oppressive,

equity will not compel observance of them by injunction, but will leave the complaining party to his remedy at law. *Rombauer* v. *Compton Heights Christian Church, supra; Robinson* v. *Edgell,* 57 W. Va. 157, 49 S. E. 1027; *Ludgate* v. *Somerville,* 121 Or. 643, 256 P. 1043, 54 A. L. R. 837.

The changes shown by the evidence and mainly relied on by plaintiffs to require cancellation of the restrictions are these:

A large zipper factory is being operated just west of the plaintiffs' lots, employing some 300 people and running day and night;

Lot 40, block 7, between the lots of the plaintiffs and that of Mrs. Fleming, has been converted into a hard-surfaced road to provide a way from the factory to Jefferson avenue, or Route 168;

Route 168, on which all the lots of the subdivision abut, has developed from a two-lane roadway, carrying a small amount of traffic, to a four-lane Federal Highway, carrying most of the traffic in and out of Newport News;

Directly across Route 168 has been constructed a large shopping center, consisting of grocery stores, hardware stores and restaurants, immediately north of which is Briarfield road, with which the roadway over lot 40 connects;

Diagonally across Route 168, and opposite the lot of Mrs. Fleming, is a skating rink on lot 28, block 4.

After Parkview was subdivided, several other residential subdivisions have been developed just to the east of Parkview known as East Hilton, Betsy Lee Gardens, Sussex Hilton, Hilton Park and Briarfield Manor.

Witnesses for the plaintiffs expressed the categorical opinion that the essential objects and purposes of the original restrictions on the lots in Parkview to residential use have been destroyed by the changed conditions. These included Mr. Falk, former sales manager for Old Dominion Land Company, who helped plan the original development, and some members of the Zoning and Planning Commissions of Warwick county, which Commissions had recommended to the Board of Supervisors that the Parkview area be zoned

for limited commercial activity. However, when the reasons for their views are examined, it is apparent that they rest upon the fact that the Parkview property, particularly the plaintiffs' property, is now more valuable for commercial uses than for residential purposes; not that the objects and purposes of the restrictions have been practically destroyed, or in fact that there has been any material change in them.

The answer of the Old Dominion Land Company asserts, as stated, that the object and purposes of the restrictions were to promote the sale of the property and to preserve it for the stated time, primarily as a residential section. Not only is there no evidence to refute that, but the development in the subdivision has been exactly in accord with that purpose.

The zipper factory was converted from a laundry built by the Federal government during the war on land sold by the Old Dominion Land Company to the Chesapeake and Ohio Railway Company for industrial uses before any lots were sold in this Parkview subdivision; and lot 40 was converted by the same authority into a road to the laundry during the same period.

While Route 168 has now become a four-lane highway, it is of the same width and on the same location as shown on the map. The travel surface of it has been widened and there is more traffic on it, but that is a natural result of growth of population, to which the development of the subdivision would be expected to contribute. Because there is more traffic on the street is no sufficient reason for lifting the restrictions to permit more business houses among the residences.

The shopping center is on property likewise not included in the subdivision and which was shown on the subdivision map without any indicated restrictions. This is at the corner of Jefferson avenue and Briarfield road, and immediately south of it and opposite the southern end of Parkview is the residential development of Betsy Lee Gardens. The skating rink is located just across Briarfield road on a lot marked "business" on the Parkview map.

"* * * Residential districts and business districts must necessarily adjoin each other in cities. The fact that the same grantor may restrict a certain area and sell another abutting on it without restriction, cannot, in itself, estop purchasers in the former from enforcing compliance with such restriction." *Bohm* v. *Silberstein*, 220 Mich. 278, 189 N. W. 899, 901.

There have been changes, of course, as it was necessarily contemplated there would be. It was expected that the lots marked for "business" would later have business establishments on them and that the lots restricted to residences would have residences on them; that the land conveyed to the railway company for industrial uses would be used for that purpose, and that the adjoining property might be used for such purposes as the owners desired. At the time of the subdivision and lot sale, the area involved was unimproved wooded land, as was most of the area surrounding it. The changes within the area, so far from being destructive of the objects and purposes of the development, have been as planned by the development, as is demonstrated by the map from which the land was sold.

The subdivisions to the east of Parkview have all developed as residential property and no provision was made for business places within those tracts. Plaintiffs' witness, Mr. Wood, member of the Planning Commission, testified that if any change had occurred in the nearby developments, it had been a change into a residential neighborhood. As a reason for his opinion that the logical use for the plaintiffs' property was business, Mr. Falk stated that there should be additional stores there to round out the shopping center and to serve the residents of that area.

Perhaps that is logical, and perhaps, also, if Parkview were now being subdivided, that change would be made; but that is not the use the plaintiffs covenanted to make of their property when they bought it; and it is not the use the Old Dominion Land Company represented to the appellee and other purchasers of residential lots would be made of it when they bought their lots and built their homes.

The former sales manager testified that the lots were sold by the map; when the lots marked "business" were sold, it was represented to the purchasers that the lots not so marked could be used only for residences, and that the company received a higher price for the business lots because of the residential restrictions. By the same token, he testified, the values of the lots designated as residential were enhanced by the residential restrictions.

Thus it would occur that elimination of these restrictions would result in taking away a value bought and paid for by the owners of both business and residential properties, and in many instances without so much as a "by-your-leave," because many of the owners are not before the court.

Equity should not set at naught solemn covenants voluntarily made, when to do so would enrich the covenantor and injure the covenantee.

The lots sold subject to the restrictions have not diminished, but have increased in value. Mrs. Fleming paid $250 for her lot. She now has a home on it, but Mr. Falk testified it would be worth $500 now, unimproved. He would not say any of the lots could not be used for residential purposes, but only that they are no longer as desirable for residential use. He testified that for residential use the plaintiffs' lots would be worth around $750 to $1,000, but that he could sell them "with the development" for $7,500 to $10,000. The Bookers paid $4,000 for their two lots in June, 1946. Mr. Booker testified he did not know whether he "was going to have a residence there or a business." He bought it for an investment and thought it was a good buy. The sales map indicates these two lots originally sold for $725. He desires now to open up a restaurant on the property.

As was said in *Allen* v. *Massachusetts Bonding, etc., Co.*, 248 Mass. 378, 143 N. E. 499, 502, 33 A. L. R. 669, in enjoining the violation of a building restriction:

"The great increment in the value of the land of the defendant which will arise from refusal to enforce this restriction is of slight if any consequence. The restriction

was matter of record in the chain of the defendant's title and the defendant was bound by notice thereof. \* \* \*."

And in *Bohm* v. *Silberstein, supra,* 189 N. W. 901: "\* \* \* The question presented is not whether any person would, under existing conditions, purchase vacant property in the subdivision for residential purposes, but may the plaintiffs enjoy the homes, which they have erected relying upon the restrictions, free from the disturbances which the conduct of business therein would necessarily produce?" See *Marra* v. *Aetna Const. Co.,* 15 Cal. (2d) 375, 101 P. (2d) 490, 493; *Continental Oil Co.* v. *Fennemore,* 38 Ariz. 277, 299 P. 132; *Vernon* v. *Reynolds Realty Co.,* 226 N. C. 58, 36 S. E. (2d) 710.

*Cuneo* v. *Chicago Title, etc., Co.,* 337 Ill. 589, 169 N. E. 760, 763-64, was a suit to remove building restrictions for changed conditions similar to those urged here, including greatly increased traffic on an adjoining road, the fact that the property of plaintiffs had become useful only for business purposes and had ceased to be suitable or desirable for residence, and that the subdivision had been zoned as commercial or apartment property and as such heavily taxed. In refusing to annul the restrictions the court said:

"Restrictions upon the use of property such as were created by the deeds to this subdivision, and which are imposed as a part of a general plan for the benefit of all the lots affected, give to the purchasers of such lots a right in the nature of an easement, which will be enforced in equity, and upon equitable principles, against owners of other lots so affected. \* \* \* .

"\* \* \* While changes have taken place on Sheridan road, and appellants' property abutting on that street would doubtless be more valuable as commercial property than as residence property, yet equity cannot, on that ground alone, abrogate and set aside restrictions on the use of that property which have been made for the benefit of other property which has not been so changed. While it may be a financial hardship upon appellants to enforce the single-dwelling restrictions on their lots, yet it must be borne in mind that

these restrictions were in the deeds which they took to the property, and are made for the benefit of all of the lots on Castlewood terrace. If the character of the property on Castlewood terrace had by the acts of the owners thereof changed to the extent justifying a court of equity to remove restrictions, that court should not hesitate so to do, but the fact of change in the neighborhood of the property on Castlewood terrace does not, alone, warrant a court of equity in relieving the property of appellants here from the restrictions imposed. They admit that they knew when they purchased their respective lots of these restrictions of the use to which they could put their property. * * *.

"* * * Equity will remove such restrictions only when to do so will not unjustly injure other property. That situation does not exist here." See also, *Drexel State Bank* v. *O'Donnell*, 344 Ill. 173, 176 N. E. 348.

In *Van Meter* v. *Manion*, 170 Okla. 81, 38 P. (2d) 557, 562, involving the right to erect a business building, against plat restrictions prohibiting such use, on the ground of changed conditions, it was said:

"* * * But the fact that traffic has increased on the streets bounding the restricted area and the fact that a suburban business district has been established adjacent to the district and that other minor changes have occurred, coupled with the fact that plaintiff might profit by the establishment of a business on his property, is not sufficient to show that the original plan or purpose may no longer be accomplished, and does not justify an invasion of the rights of property owners in this district who relied upon the terms of the restrictive covenant when they purchased or built homes within the district."

See *Wineman Realty Co.* v. *Pelavin*, 267 Mich. 594, 255 N. W. 393; *Bickell* v. *Moraio*, 117 Conn. 176, 167 A. 722.

As said in the case last cited, in a building development plan the creation of an area restricted to residences contemplates the continued existence of such an area from which business is excluded. It is to prevent the anticipated encroachment of business on the protected area that the restric-

tions are created. Purchasers of lots in such an area buy in reliance upon the fact that all other lots in the area are subject to the same restriction, and that the entire development will retain its character as a purely residential district. The very purpose of the restriction is to prevent the property from being converted to business use if it should become more valuable for that use.

We have discussed the principles involved, as do most of the cases, from the standpoint of whether, because of alleged changed conditions, it would be inequitable to require by injunction the observance of the restrictions. This proceeding, however, is, as stated, under the Declaratory Judgment Act, to secure a decree adjudicating that the restrictive covenants are of no force or effect. Such a proceeding differs from a suit to enjoin a breach of the restrictions. There equity might refuse an injunction and remit a plaintiff to an action at law for damages, basing the refusal on the ground that an injunction would do great injury to the defendant and be of little value to the plaintiff. The relief here sought, if granted, would nullify the covenants, at least in plaintiffs' title, for all time and all purposes, even though future changes might completely remove the ground for doing so. More is required to warrant such a decree than is necessary when only the injunctive powers of equity are exercised. It must be established that the whole plan has become inoperative and that its objects can no longer be carried out. See *Bickell* v. *Moraio, supra.*

The decree complained of reached the right of the matter and is

*Affirmed.*