Present: Hassell, C.J., Keenan, Kinser, Lemons, and Agee, JJ., and Carrico and Compton, S.JJ.

RIVER HEIGHTS ASSOCIATES
LIMITED PARTNERSHIP, ET AL.

                                            OPINION BY
v.  Record No. 030180          SENIOR JUSTICE HARRY L. CARRICO
                                         January 16, 2004
ALICE BATTEN, ET AL.

               FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
                       Paul M. Peatross, Jr., Judge

                           Procedural Background

     In a bill of complaint for declaratory judgment, Alice

Batten and other owners of lots in the Carrsbrook Subdivision

in Albemarle County (collectively, Batten)[1] sought a

declaration favoring the enforceability of restrictive

covenants prohibiting commercial use of four unimproved lots

in the same subdivision, namely, Lots 1, 2C, and 2D in Section

C and Lot 1 in Section E.  River Heights Associates Limited

Partnership is the record owner of Lot 1, Section C, which it

acquired in 1998, S.V. Associates is the record owner of Lots

2C and 2D, Section C, which it acquired in 1978, and First

Gold Leaf Land Trust is the record owner of Lot 1, Section E,

which it acquired in 1986.  Batten named these record owners

as the defendants in her bill of complaint.

_____

     [1] The other lot owners are James W. Craig, Anthony A.
Hastoglis, Elizabeth S. Hastoglis, Joseph T. Mason, Nancy P.
Mason, Thomas A. McQueeney, Catherine C. Teague, Joseph W.
Teague, Jr., Edith L. B. Turner, Robert E. Whitworth, John W.
Wolcott, III, and Karen Wolcott.

Although the entities just listed hold title to the four lots in question, the briefs describe Wendell W. Wood and his wife, Marlene C. Wood, as the beneficial owners of the lots. While the Woods were not named as defendants below and are not parties to this appeal, the appellants in the case are referred to collectively in the briefs as "Wood," and we will follow the same practice.

Wood demurred to the bill of complaint on the grounds, inter alia, that Batten had failed to state a cause of action upon which relief could be granted and had failed to allege the existence of a controversy pursuant to Code § 8.01-184, a part of the declaratory judgment statutes, so as to confer jurisdiction over the claims asserted in the bill of complaint. The trial court overruled the demurrer on these grounds but sustained it on other grounds not pertinent here and allowed Batten to file an amended bill of complaint.

Batten filed an amended bill not differing in substance from her original bill. Wood filed an answer to the amended bill in which he denied the essential elements of Batten's claim for relief. In a section styled "Affirmative Defenses," Wood contended that Batten had failed to state a cause of action upon which relief could be granted, that the restrictive covenant was unenforceable, and that the covenant

did not apply to his property.  Wood also contended that he had no knowledge of the covenant.

### Evidentiary Background

Carrsbrook Subdivision is located on the eastern side of U.S. Route 29 between the northern city limits of Charlottesville and the Rivanna River.  The four lots here in dispute are located at the western edge of the subdivision and are the only lots with frontage on U.S. Route 29.

The restrictive covenants were established in a deed dated May 6, 1959, from Norman Kelsey and wife to Charles W. Hurt (the Kelsey-Hurt deed), which conveyed an unsubdivided 40-acre portion of "the land known as 'Carrsbrook.' "  The conveyance was made subject to "certain restrictions . . . which shall be considered as covenants running with the land." Only one of the restrictions is pertinent here:  "The property is to be used for residential purposes only and no rooming house, boarding house, tourist home, or any other type of commercial enterprise, or any church, hospital, asylum, or charitable institution shall be operated thereon" (the restrictive covenant).

In October 1960, Section C of Carrsbrook was subdivided into 19 lots, all made "subject to the restrictive covenants applicable to Carrsbrook Subdivision of record."  An attached plat shows Lot 1 as containing 3.04 acres bordering Carrsbrook

3

Drive, Indian Spring Road, and Route 29.  Lot 2 is shown as containing 2.55 acres bordering Indian Spring Road and Route 29.  A notation on the plat states that "[l]ots 1 & 2 restricted to non access on Rte. 29 if lots are used for residential purposes"  (the plat note).

In 1962, Lot 2, Section C, was resubdivided into four lots, namely, 2A, 2B, 2C, and 2D.  Lots 2C and 2D border Route 29.  Lots 2A and 2B border only Indian Spring Road, leaving Lots 2C and 2D without direct access to the residential roads in the subdivision and Lots 2A and 2B without direct access to Route 29.  In addition, Lots 2C and 2D, along with Lot 1C, are subject to the plat note.

In 1969, Albemarle County adopted its first comprehensive zoning ordinance.  The lots in question were zoned to a depth of 200 feet from Route 29 in a B-1 classification, a commercial district in which residential use is prohibited.[2] This zoning classification was continued in a comprehensive rezoning in 1980, with the result that presently the lots in question are zoned for commercial use but are subject to the restrictive covenant prohibiting such use.

When Carrsbrook Subdivision was created in 1969, Route 29 was a two-lane road with residences and small businesses located on each side of the road.  In the area where the lots

_____

[2] The southern portion of Lot 1C remains residentially zoned.

4

in question are located, Route 29 is today an eight- to ten-lane road that is highly developed commercially on both sides with shopping centers, hotels, restaurants, automobile dealerships, and other types of businesses. No residential uses have been implemented along Route 29 since 1959. There have been no changes within the Carrsbrook Subdivision other than the aging of homes and the maturing of trees.

## The Trial Court's Decision

At the conclusion of an ore tenus hearing, the trial court held that the restrictive covenant against commercial use did apply to the four lots in question and that the covenant was enforceable. The court entered a final decree declaring the covenant enforceable and enjoining the use or operation of the lots in violation of the covenant, including developing the lots commercially in the future. We awarded Wood this appeal.

## Entitlement to Declaratory Relief

Wood has assigned three errors. One of the assignments alleges that the trial court "erred as a matter of law in overruling Wood's Demurrer, Motion to Strike, and his renewal of the Motion to Strike [at] the conclusion of all the evidence on the basis that the declaratory judgment suit was

5

improper under the declaratory judgment statutes [in] the Code of Virginia."[3]

## Wood's Demurrer

In support of his demurrer, Wood cites City of Fairfax v. Shanklin, 205 Va. 227, 135 S.E.2d 773 (1964), a case where we dismissed a motion for declaratory judgment. Quoting Shanklin, Wood says the test for determining the efficacy of a declaratory judgment proceeding is whether "[t]he controversy [is] one that is justiciable, that is, where specific adverse claims, based upon present rather than future or speculative facts, are ripe for judicial adjustment." Id. at 229, 135 S.E.2d at 775. And, Wood adds, Shanklin teaches that courts are not vested with authority "to render advisory opinions, to decide moot questions or to answer inquiries which are merely speculative." Id. at 229-30, 135 S.E.2d at 776. Wood argues that the allegations of Batten's bill of complaint did not meet this test and that this case should never have proceeded past the demurrer stage.

Wood correctly states the rules enunciated in Shanklin. But the case is inapposite; its facts differ substantially from those in the case at bar. In Shanklin, a taxpayer sought to have declared invalid provisions of the city zoning ordinance that conferred on the Board of Zoning Appeals

---

[3] Code §§ 8.01-184 to -191 comprise the Declaratory Judgment Act.

6

authority to issue special permits for the construction of apartments.  We held that no justiciable controversy existed because no specific case regarding apartment usage within the city was involved and because the Board might never again be called upon to act on an application for a special permit for apartments.  Therefore, we said, too much was left to speculation.  Id. at 231, 135 S.E.2d at 776.  Here, a specific case is involved, and it places in controversy the use of land for commercial purposes.

Wood also argues that the bill of complaint failed to allege an imminent threat of development necessary to maintain a suit for declaratory judgment.  Wood acknowledges that "[t]his Court has not held that a party (such as Wood) must establish a vested right or obtain the benefit of some significant governmental act before other affected landowners can utilize the declaratory judgment process to determine the rights of the parties."  Yet, Wood submits, "something more than mere speculation — which is all that exists here — is required [to] invoke the power of the Courts."  Then, citing Hoffman Family, L.L.C. v. Mill Two Associates P'ship, 259 Va. 685, 529 S.E.2d 318 (2000), Wood says the "something more" consists of " 'substantial steps,' such as the expenditure of significant monies or the development of specific plans, to

7

create a justiciable controversy under the Declaratory Judgment Act."

We did point out in Hoffman that the developer there had "taken substantial steps, with significant financial expense, in developing specific plans for the development" involved in that case.  Id. at 693-94, 529 S.E.2d at 323.  But we did not establish the requirement that such "significant financial expense, in developing specific plans for . . . development," must be alleged and proven in every case where declaratory judgment relief is requested.  Rather, the case merely represents one example of where proof and allegation are sufficient to take a prospective development out of the realm of speculation.  The important precedential value of the case is found in its holding that a developer need not have governmental approval to proceed with a project before a party adversely affected may seek relief via declaratory judgment. Id.

The present case is akin to Cupp v. Board of Supervisors of Fairfax County, 227 Va. 580, 318 S.E.2d 407 (1984).  There, Cupp and his wife, owners of a nursery, applied for a special exception to permit modification of the layout of their nursery.  The Planning Commission recommended that the application be approved on the condition that the Cupps construct a right turn lane for entrance to the nursery and

dedicate a right-of-way up to 100 feet from the centerline of the highway. The Cupps objected to the requirement for construction and dedication. The Board denied the application, and the Cupps filed a motion for declaratory judgment challenging the requirement. 227 Va. at 584-88, 318 S.E.2d at 408-10.

The Board contended there was no controversy between the parties sufficient for the Cupps to maintain a claim for declaratory judgment. The trial court held the Cupps could maintain their suit and we affirmed, holding that although the Board had not yet imposed the restrictions and conditions, "it claimed it had the power to do so and this claim of power threatened the Cupps [and thus] a controversy, within the contemplation of the Declaratory Judgment Act, existed." Id. at 593, 318 S.E.2d at 414.

Here, Batten's bill of complaint alleged Wendell Wood had met with members of the Carrsbrook Subdivision and "indicated that he intended to commercially develop the properties at issue [and] he spoke of developing a commercial three (3) story office building with related parking facilities." Further, the amended bill alleged that Richard E. Carter, an attorney, had written Wendell Wood a letter stating that the "properties [in question] were bound by restrictive covenants

9

and could not be used commercially."[4]  In response, Wendell Wood told the attorney "that he did not believe the restrictions applied to his property and that it was his express intention to develop any of the properties he owned on Route 29 as commercial property and that he wanted to make sure that there was no mistake as to his intentions."

The bill also alleged that Donald A. Swofford, a local architect, had stated in a letter to one of the complainants that Wendell Wood had asked Swofford "to provide him with a proposal to do a planned development for the sites [in question, using a style called 'Albemarle-Georgian'], including an entry to the Carrsbrook neighborhood."  Swofford also stated that he was providing Wendell Wood "with that proposal now to the end that we would have drawings and sketches for the neighborhood to review in approximately two months."[5]

In overruling Wood's demurrer, the trial court stated that Batten had "pled sufficient facts establishing an actual case or controversy under the Declaratory Judgment Act."  We agree with the trial court.  Just as in Cupp, Wood's assertion

_____

[4] When Carter testified later in the ore tenus hearing, he said that he had been contacted by a resident of Carrsbrook Subdivision to render an opinion on whether "two lots in Carrsbrook could be used for commercial purposes."

[5] In his testimony at trial, Swofford waffled somewhat about his arrangement with Wood.  However, on demurrer, we take as true the facts alleged in Batten's bill of complaint for declaratory judgment.

10

here that he had the power to develop the lots in question for commercial use and that he would exercise that power threatened Batten.  And the imminence of the threat was supplied by the statement in Swofford's letter about having "drawings and sketches for the neighborhood to review in approximately two months."  Thus, a controversy within the contemplation of the Declaratory Judgment Act was sufficiently alleged in Batten's bill of complaint, and the trial court did not err in overruling Wood's demurrer.

Proof of Justiciable Controversy

This brings us to the denial of Wood's motions to strike Batten's evidence at the ore tenus hearing.  Wood argues that the motions should have been granted because Batten did not prove the allegations of her bill of complaint and thus failed to establish a justiciable controversy under the declaratory judgment statutes.  Wood says it was unrebutted at trial that he "*did not* have plans prepared at his request to immediately develop the property"; he "*never* stated that he would proceed with development without the Complainants' consent"; he "*did not* ask a local architect to provide him with a proposal to do a planned development"; he "*never* hired a planner"; he had no "plans underway to prepare drawings in approximately two months;" and he "*never* incurred significant financial expense

11

— or any expense whatsoever — with respect to the development of these properties."

If this analysis of the record were accurate, we might be inclined to agree with Wood that Batten failed to prove a justiciable controversy entitling her to declaratory judgment relief. But the analysis is not accurate. It completely disregards the most significant evidence in the case on the issue of Batten's entitlement to declaratory judgment relief — the evidence of Wood's meeting with the property owners in Carrsbrook Subdivision.

Wood requested this meeting. He says he wanted the meeting to avoid a lawsuit and he proposed a compromise under which he would spend up to $50,000.00 to build an entranceway into Carrsbrook Subdivision provided the Carrsbrook lot owners consented to his plan to develop the property in question with an office complex. In these circumstances, it is clear that an actual controversy existed over whether Wood could develop the property in question for commercial purposes. Indeed, Wood's offer to pay $50,000.00 to make peace with the Carrsbrook lot owners is proof that an actual controversy existed. Furthermore, Wood's offer to pay the $50,000.00, made in light of his statement that "he wanted to make sure there was no mistake as to his intentions" to develop the property with or without the consent of the Carrsbrook lot

12

owners, bespeaks immediacy; in other words, consent now or suffer the consequences.  Hence, there was a justiciable controversy, one "ripe for judicial adjustment," Shanklin, 205 Va. at 229, 135 S.E.2d at 775, and the trial court did not err in denying Wood's motions to strike Batten's evidence.

The Restrictive Covenant Vis-a-Vis The Plat Note

In another assignment of error, Wood alleges that "[t]he Trial Court erred in failing to resolve the conflict between the restrictive covenants on Lots 2C and 2D, and preventing the commercial use of these two lots as zoned."  It will be recalled that the restrictive covenant prohibits commercial use of the three lots and the plat note prohibits access from the lots to Route 29 if they are used for residential purposes.

Wood says there is a fundamental inconsistency between the restrictive covenant and the plat note in this case — the restrictive covenant prohibits commercial use of the three lots and the plat note denies access to the lots fronting Route 29 when used for residential purposes, leaving Lots 2C and 2D without any useable access.  This creates a patent ambiguity, Wood maintains, and since restrictive covenants must be strictly construed, Waynesboro Village, L.L.C. v. BMC Properties, 255 Va. 75, 80, 496 S.E.2d 64, 67-68 (1998), the doubt must be resolved against the covenant and in favor of

13

the free use of the property. Wood concludes that when the doubt here is resolved in favor of the free use of the lots in question, it is clear that "[b]y restricting access to Route 29 to only non-residential uses, the [plat note] specifically contemplated use of the parcels for commercial uses."

We disagree with Wood. No ambiguity exists between the restrictive covenant and the plat note. The restrictive covenant deals only with the use that may be made of the property, without any reference to access. The plat note deals only with access to the property, without any reference to use, and it cannot be construed, therefore, as a basis for saying that the note restriction "specifically contemplated use of the parcels for commercial uses."

A further reason exists for saying that the plat note did not "specifically contemplate[] use of the parcels for commercial uses." The plat and the instrument to which it was attached created the Subdivision of Section C "Carrsbrook," including Lot 2, the parcel from which Lots 2C and 2D later evolved. The instrument provided that the numbered lots shown on the plat "are subject to the restrictive covenants applicable to the Carrsbrook Subdivision of record in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, in Deed Book 348 page 235." The covenants recorded in that deed book include the very covenant that prohibits

14

commercial use of lots in Carrsbrook Subdivision, without excepting Lots 2C and 2D. So, when the plat note and the restrictive covenant are read together, as they must be read, it is certain that the plat note could not possibly have contemplated commercial use of the parcels.

Wood complains that the result of the trial court's decision "is to allow Wood no use of these lots for anything other than open space," resulting in a serious dimunition in the value of the lots. However, Booker v. Old Dominion Land Co., 188 Va. 143, 152, 49 S.E.2d 314, 319 (1948), is authority for the proposition that the effect on the value of property resulting from the enforcement or a refusal to enforce a restrictive covenant " 'is of slight if any consequence' " (quoting Allen v. Massachusetts Bonding & Ins. Co., 143 N.E. 499, 502 (Mass. 1924)). Furthermore, Wood had at least constructive notice from the record chain of title of both the restrictive covenant that prohibits commercial use of his property and the plat note that denies Lots 2C and 2D access to Route 29 if developed residentially.

Wood claimed he did not know of the restrictions or thought they would expire in twenty years. However, the very deed by which Wood acquired title to Lots 2C and 2D[6]

---

[6] This deed, from Charles W. Hurt and Letitia H. Hurt to Wendell W. Wood, was dated December 7, 1968, and recorded

15

specifically provided that the lots were subject, without any time limitation, (1) to the restrictions set forth in the Kelsey-Hurt deed of 1959, which included the noncommercial use restriction, and (2) the restrictions set forth in "an instrument with the plat of Subdivision of Section C, Carrsbrook," the plat containing, of course, the restriction denying Lots 2C and 2D access to Route 29 if developed residentially.  But, whether Wood actually knew of the existence of the restrictions or their length, his fate is to be determined by what he should have known, harsh though the result might be.  "Equity should not set at naught solemn covenants voluntarily made, when to do so would enrich the covenantor[7] and injure the covenantee."[8]  Booker, supra, 188 Va. at 152, 49 S.E.2d at 319.

### Change of Conditions

In his remaining assignment of error, Wood alleges that "[t]he trial court erred in failing to remove the residential restrictive covenant as to all four lots (Lots 1E, 1C, 2C, and

---

among the land records of Albemarle County in Deed Book 452 at Page 475.

[7] Wood concedes the obvious — "the property was more valuable for commercial rather than for residential uses."

[8] Batten presented evidence about how the residents of Carrsbrook Subdivision would be damaged if Wood is allowed to develop his property commercially.  The prospective damage took the form of decreased value of Carrsbrook property, additional noise and artificial light, and increased traffic congestion on Carrsbrook Drive, the primary entranceway for the subdivision.

2D) in light of the overwhelming evidence that established a change of conditions so radical as practically to destroy the essential objects and purposes of the restriction."

Wood stresses the changes, outlined supra, that have taken place in the Route 29 corridor since Carrsbrook Subdivision was created in 1969, viz., the previous two-lane road with residences and small businesses strung along each side has become a heavily traveled eight- to ten-lane thoroughfare lined on each side with shopping centers, hotels, restaurants, automobile dealerships, and other types of businesses.  Further, Wood also stresses the fact that "no residential houses have been built or used from the city limits of Charlottesville to the South Rivanna River on either the east or west side of Route 29 in the last thirty years."[9]

The test for determining whether changed conditions warrant the nullification of a restrictive covenant was enunciated in Deitrick v. Leadbetter, 175 Va. 170, 8 S.E.2d 276 (1940), as follows:

> "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes

---

[9] Wood also stresses the zoning changes that have occurred along both sides of Route 29 since the restrictive covenant was created.  However, in Ault v. Shipley, 189 Va. 69, 75, 52 S.E.2d 56, 58 (1949), this Court said that "a zoning law cannot constitutionally relieve land within the district covered by it from lawful restrictive covenants affecting its use for business purposes."

17

> must be so radical as practically to destroy the essential objects and purposes of the agreement."

175 Va. at 177, 8 S.E.2d at 279 (quoting <u>Rombauer v. Compton Heights Christian Church</u>, 40 S.W.2d 545, 553 (Mo. 1931)).

Wood takes the trial court to task, saying that the court "ignored the radical changes that have occurred in and around the subject properties since 1959, but rather focused myopically on whether or not there have been changes within the *interior* of the Subdivision."  This is an unfair representation of what the trial court ruled in this case.

In a letter opinion, the trial court wrote: "[Wood has] failed to prove that radical changes <u>both in and around the neighborhood</u> have occurred such that the purpose of the restrictive covenant is destroyed."  (Emphasis added.)  Thus, it is clear the court did not focus upon conditions in Carrsbrook Subdivision alone but on conditions "around the neighborhood" as a whole.

This is in accord with Virginia law.  In <u>Booker</u>, <u>supra</u>, relief was sought from a restrictive covenant prohibiting commercial uses of residential lots in a subdivision.  It was alleged that there had been a change of conditions so radical as to destroy the essential objectives and purposes of the covenant.  These changes included the operation of a nearby zipper factory, the conversion of one of the lots into a hard-surfaced road leading to the factory, the widening of the road

18

on which all the lots abutted from a two-lane roadway, carrying a small amount of traffic, to a heavily traveled four-lane federal highway, the construction nearby of a large shopping center, and the presence of a skating rink across the road from one of the lots. 188 Va. at 149, 49 S.E.2d at 317.

The trial court refused to remove the restrictive covenant. This Court affirmed. We said that "if a radical change takes place in the whole neighborhood so as to defeat the purpose of the restrictions and render their enforcement inequitable and oppressive, equity will not compel observance of them by injunction." Id. at 148-49, 40 S.E.2d at 317. (Emphasis added.) See also Marks v. Wingfield, 229 Va. 573, 576, 331 S.E.2d 463, 465 (1985).

Wood seemingly would have the rule the other way — ignore the circumstances within the property protected by a restrictive covenant and focus only upon the surrounding area. However, common sense tells us that when the issue is whether a restrictive covenant still serves its intended purpose and that purpose is to protect the lots in a particular subdivision from commercial uses, the conditions existing within the subdivision must be examined along with those existing in the surrounding area in order to determine the issue fairly. To ignore the conditions within the subdivision and to hold the covenant unenforceable solely because of

19

changed conditions elsewhere would deny the lot owners the protection to which they are entitled according to a solemn covenant voluntarily made, and that would be grossly unfair.

What is required, therefore, is a leveling exercise in which fair consideration is given both to conditions in the subdivision and those in the surrounding area. Here, the facts are that there have been no changes within Carrsbrook Subdivision other than the aging of homes and the maturing of trees but there have been substantial changes within the surrounding area. After giving fair consideration to both situations, we are of opinion the changes are not so radical as to defeat the purpose of the covenant.

Finally, Wood cites Chesterfield Meadows Shopping Center Associates, L.P. v. Smith, 264 Va. 350, 568 S.E.2d 676 (2002). That case involved a covenant that restricted the use of one piece of property to protect a historic home located on other property across the road. Later, the historic home was moved to a different location and, in the meantime, the surrounding area had been transformed into a thriving commercial area. This Court affirmed the trial court's nullification of the covenant, holding that such a radical change satisfied the standard articulated in Booker and its progeny. Id. at 356-57, 568 S.E.2d at 680. However, Chesterfield Meadows is inapposite. Lacking here is a radical change like moving a

20

historic home from its protected location, which negates the very purpose of the restrictive covenant.

Conclusion

For the reasons assigned, the judgment of the trial court will be affirmed.

Affirmed.