# CIRCUIT COURT OF FAUQUIER COUNTY

Bellevue Landowners' Council, Inc.

v.

Charles G. Marterella
and Lori K. Marterella

September 25, 2009

Case No. CL08-007

BY JUDGE JEFFREY W. PARKER

This matter comes before the Court on a Motion by the Complainant for Judgment Notwithstanding the Verdict or alternatively to set aside the verdict and grant a new trial.

This case was initiated by a Complaint for Injunctive Relief filed by the Bellevue Landowners' Council, Inc. (BLOC) versus Charles G. and Lori K. Marterella (Marterella or Defendants). The Marterellas are property owners in the Bellevue subdivision and operate a small winery on their lot. In the Complaint, BLOC seeks to enjoin the on-site retail sale of wine by the Marterellas, alleging they are violating the recorded restrictive Covenants governing their property. In response, the Defendants filed a Plea in Equity asserting selective enforcement of the Covenants, estoppel, and waiver. The

Defendants demanded and were granted a jury trial pursuant to § 8.01-336(D) of the Code of Virginia. Prior to the commencement of the jury trial, the Court ruled, upon Motion for Partial Summary Judgment, that the retail sale of wine was a commercial activity and that Article III, Section 3, of the Declaration of Covenants was applicable to this activity.

After a three day jury trial, the jury returned its verdict in favor of the Defendants. For the reasons set forth herein, the verdict will be set aside and judgment granted in favor of the Complainants on the Defendants' plea in equity.

## Analysis

The Complainant alleges that the verdict of this jury was plainly wrong or without credible evidence to support it. A party who comes before the Court with a jury verdict occupies the most favored position known to law. *Atrium Unit Owners Ass'n v. King*, 266 Va. 288, 292, 585 S.E.2d 545 (2003). However, if the jury verdict is a result of mere conjecture or speculation, it must be reversed. In analyzing the result, the recipient of a favorable jury verdict receives the benefit of all substantial conflicts and all reasonable inferences to be drawn from the evidence. *Burroughs v. Keffer*, 272 Va. 162, 164, 630 S.E.2d 297 (2006).

The Marterellas' defense to the BLOC's claim for the enforcement of the Covenant has come down to two issues, estoppel and waiver. See Jury Instruction E and N-1. Although selective enforcement was also pleaded as a separate defense, it effectively is subsumed within the estoppel claim. Allegations of ambiguity are commonly used in defense to the enforcement of restrictive covenants. See e.g. *Lovelace v. Orange County Bd. of Zoning Appeals*, 276 Va. 155, 661 S.E.2d 831 (2008). However, the Defendants claim that the language of the documents, Site Handbook and Covenants, was *unambiguous* and not capable of any other reasonable interpretation other than that retail wine sales were permitted.

## Estoppel

In order to prove estoppel, the Marterellas had to show by clear and convincing evidencing that:

(1) BLOC through its Site Committee or Board made statements or otherwise showed through their conduct that the use of the property by the Marterellas was permitted in Bellevue Farms, and;

(2) The Marterellas reasonably believed their use was permitted and relied upon statements or conduct of BLOC in engaging in a specific use for their property; and

(3) The Marterellas incurred expenses in adopting their specific use for their property in reasonable reliance upon statements or conduct from BLOC that the use would be permitted; or

(4) BLOC should be estopped from enforcing the covenants if the Marterellas proved by clear and convincing evidence that Bloc has not enforced the covenants uniformly, consistently, reasonably, and in good faith against all lot owners in Bellevue Farms.

Bellevue Farms is a large subdivision consisting of hundreds of acres divided into lots varying from 10 to 25 acres in size. It was dedicated in 1975, and, at that time, a Declaration of Covenants was recorded setting forth a number of binding conditions upon all of the lots. In the introductory language of the Declaration of Covenants, it was recited that the Declarant intended to create a "residential community," so that the landowners could enjoy the "open spaces, bodies of water, recreational facilities, roadways and trail easements for horse-back riding, carriage driving, bicycling and hiking." Further, the Declarations provided that "in order to ensure the use and development of said property for exclusive [sic] residential and agricultural purposes only. . . ." the limitations therein were to be applied, with enforcement delegated to a Site Committee having "the power to pass judgment on certain facets of the development of individual Tracts by individual landowners. . . ." (Def. Ex. 1.)

Under Article II of the Declaration, Section I, "[a]ll tracts in the [subdivision] shall be exclusively used for residential, agricultural, and recreational purposes." In Article III, Section 3, "[n]o commercial enterprises may be undertaken on the property, which, in the Committee's opinion, is in conflict with the goals of these Covenants." Throughout the history of this subdivision, the Site Committee has been active on behalf of BLOC, and, in an effort to fulfill their duties as set forth in the Covenant, issued a Handbook on September 18, 1994. In contrast to the wording of the Covenants or other similar legal documents, the Handbook was written in an informal, casual style and was 16 pages in length. It addressed a number of issues not currently before the Court. However, quite relevant to these proceedings was the language contained on page 11, in pertinent part, as follows:

What businesses are allowed in Bellevue?

Agriculture is the only commercial activity expressly permitted under the covenants. Any other work whether as a self-employed person or as an employee that causes external change to your property or leads to regular visits by *customers, suppliers, business associates*, or others is not acceptable.

If you wish to engage in *non-agricultural business* activity, the Committee will rule on its acceptability and the Board would then approve or disapprove your request.

(Def. Ex. 2 (emphasis added).)

The aforementioned statement in the Handbook is the *sole* written basis and only reference by the Defendants cited to support the position that an on-site *retail* wine operation was a permitted use under the Covenants. BLOC at no point in its Complaint contended that the cultivation and production of grapes or the bottling of wine was not a permitted agricultural activity within the subdivision. Only the on-site retail sale of food and wine by the Defendants was the subject of opposition in the Complaint filed by BLOC.

It was the Marterellas' testimony that on-site retail sale of wine is a necessary component to the operation and installation of a vineyard and farm winery on their property. The production of wine is an agricultural activity. As a result, their argument asserts that the on-site retail sale of wine by definition is an agricultural activity expressly permitted by the Site Handbook and, therefore, not a violation of the Covenants. They further alleged in their pleadings and at trial that, in order for a farm winery to be a viable economic activity, it must be permitted to engage in the retail sale of wine. The argument continues that, as the Site Committee Handbook permits agriculture and as retail sales of wine are vital to the financial viability of a farm winery, then retail sales must be included as a part of the agricultural activity of producing wine. However, this is the Marterellas' interpretation of the Site Handbook as it applies to wine production. It was not the conclusion of anyone else who testified at trial.

At no time did the Marterellas seek a formal opinion of the Site Committee or the Landowners' Association, nor did they formally disclose to anyone within the Association until September 2004 their intention to engage in retail sales. The Marterellas purchased this real property in 2000 and began planting grapes in the year 2001. In September of 2003, they applied for approval to BLOC to construct an equipment building, but did not disclose at that time that they intended to use the building for on-site retail sales of wine.

No expert testimony was presented by either party to this proceeding as to the definition, if any, of "wine production." However, even if such expert testimony had been offered, it is questionable whether this testimony could have been properly received by the Court. In a civil proceeding, only expert testimony upon issues of specialized knowledge that will "assist" the trier of fact to understand the evidence is admissible. Va. Code § 8.01-413(A). When the subject of the testimony to be provided involves only issues of common knowledge, such expert testimony is inadmissible. *Virginia Power v. Dungee*, 258 Va. 235, 258, 520 S.E.2d 164 (1999.) The term "agriculture" is a word of common parlance and is defined in the dictionary as "the science and art of farming; work of cultivating the soil, producing crops and raising livestock." *Webster's New World Dictionary*, 3rd ed. This stands in contrast to the definition of "retail," which means "the sale of goods or articles individually or in small quantities directly to the consumer." *Id.* These are obviously contrasting definitions.

The term agriculture is not defined in the Covenants, but there is no requirement for such a word *to* be defined in the Covenants in order for it to be applicable or understandable to the landowners of the subdivision. It is a word commonly understood as used in the context of this case to mean the growth and harvesting of grapes and the production of their byproducts. Consistent with the evidence as it applies to wine, the term agriculture means the cultivation, harvesting, and rendering of grapes into juice, the fermentation of that juice, and its packaging individually into wine bottles. The term would further include the *shipping* of such products off of the property for sale in a *retail* environment. But applying common knowledge of the term agriculture as set forth in the *Dictionary* or the Covenants and the Site Handbook would not include the retail sale of wine on the property where it is produced. The Court may consider and use common knowledge in analyzing the facts of any case. *Fultz v. Delhaize America, Inc.*, 278 Va. 84, 86, 677 S.E.2d 272 (2009).

This Court holds that agriculture does not include the on-site retail sale of wine by the glass. By comparison, a farmer who sells the cattle he raises on his property is engaged in agriculture, but he could not sell butchered and packaged meats to consumers on his property and still call it agriculture. The sale of wine by the glass to consumers is no different. It was unreasonable for the Defendants at the inception of the project to allege that the statements contained in the Handbook *alone* were sufficient to allow them to engage in this activity without express Site Committee approval. The Court further holds that these actions were unreasonable as a matter of law and there was insufficient credible evidence at trial to support a finding that BLOC's conduct permitted the challenged use of the property by the Marterellas within the subdivision.

The Marterellas testified they spent a substantial amount of money in purchasing the property and planting their grapes and that, but for the identified statement contained in the Site Committee Handbook, they never would have purchased their property for this purpose. Again, the Court finds that such a position is inherently incredible. There is no specific identifiable language in the referenced Handbook that justifies a reasonable person in making such expenditures with the unequivocal expectation of being permitted to conduct on-site retail sales activities. To the contrary, the Handbook specifically states that activities that cause external changes or lead to regular visits by customers are not acceptable. These on-site retail sales give rise to both of these occurrences. A reasonable person would have inquired as to whether or not such activities violate the prohibition.

Alternatively, the Marterellas argue that BLOC should be estopped from enforcing the Covenants due to selective enforcement. This form of estoppel is based upon the argument that the Covenants were not enforced uniformly, consistently, reasonably, and in good faith against all of the lot owners of the Bellevue Farms Subdivision. Again, the Court finds insufficient evidence to conclude there was selective enforcement in this case.

In support of this theory, the Defendants presented evidence that BLOC permitted another winery located a short distance from the Defendants to engage in on-site retail sales of wine, and that, therefore, to deny the Marterellas the same privilege would be impermissible selective enforcement.

The evidence, however, does not support this finding. In September of 2002, Joe Papadopoulos, a lot owner in the Subdivision, applied to the Site Committee for authorization to have a winery. His request was approved for a "2500 sq. ft. processing building for his grapes." He was also authorized to sell the product from his house and had estimated his production to be only 100 to 150 cases of wine per year. (Pltf. Ex. 5.) After approval, Mr. Papadopoulos engaged in retail sales of wine in a fashion similar to that described by the Marterellas without obtaining BLOC'S consent for the expanded use. Although there was conflicting evidence, it is apparent that as recently as 2003 (when BLOC learned that Papadopoulos' use had expanded beyond that initially approved) he was requested to address these issues with BLOC. (Pltf. Ex. 11 & 19.) Currently his use has not been challenged by BLOC in Court, but it is apparent he could still be subject to adverse action by BLOC, as he has escalated his use, without reapplying for further Site Committee approval. Evidence was received that these issues are ongoing and still not fully resolved.

However, even viewing the evidence on this issue in the light most favorable to the Marterellas does not justify a finding of selective enforcement. The Defendants correctly assert that restrictive covenants can only be enforced when there is a "reasonable employment of such restrictions." *Friedburg v. Building Committee*, 218 Va. 659, 668, 239 S.E.2d 106 (1977). This authority does not suggest that the failure of a homeowners' association to prevent one individual from violating the covenants henceforth abrogates the entire restrictive covenant.

This issue is vividly illustrated in the case of *Deitrick v. Leadbetter*, 175 Va. 170, 8 S.E.2d 276 (1940). In *Deitrick*, a subdivision lot owner sought to enforce the restrictive covenants against a fellow lot owner who was expanding his residence for use as a "Tourist Home." A tourist home, as Plaintiff's counsel stated in argument, was the 1940's version of the bed and breakfast, as it is currently called. At that time, other homeowners in the subdivision also operated similar tourist homes. Although it cannot be determined from the opinion where the other similar properties were precisely located, it was apparent that there were at least five other tourist homes within the same subdivision. Nonetheless, the Plaintiff was permitted to enforce the covenant against the defendants, with the Court stating "We need not undertake to discuss conditions far away although in the same development for they are of little importance. 'The distant Trojan never injured me'." 175 Va. at 174. Although this Court does not know the source of Justice Holt's poetic quotation, the point is clear enough to stand for the proposition that other violations of the same covenant within a subdivision do not *ipso facto* invalidate a restrictive covenant.

The Defendants also presented evidence suggesting that a variety of other commercial enterprises were permitted in the subdivision without prosecution and that such inaction by the BLOC provided additional support for the claim of selective enforcement. These other alleged commercial activities consisted of construction companies located within the homes, a dog kennel, a gun shop located within the home, horse boarding facilities, and a horseback riding school. Additionally, lot owners in the subdivision apparently engaged in hay making and cattle raising. However, none of these described activities were similar to the operation of the Marterellas' winery. There was no indication that these businesses generated the kind of consumer traffic or external change prohibited by the Covenants and the Site Committee Handbook. Further, the evidence was presented in an anecdotal fashion with very little detail as to the precise nature of these operations, the extent of their retail sales or volume of business, the impact on the community, or other

factual information which would permit a reasonable fact finder to conclude that these alleged violations were similar in nature to the activities of the Defendants.

## *Waiver*

The right to enforce a restrictive covenant may be lost by waiver, abandonment, or acquiescence, but the party asserting waiver must show that the violations have so affected the neighborhood so as to be of no substantial value to the property owners. *Village Gate Homeowners' Ass'n v. Hale*, 219 Va. 321, 324, 246 S.E.2d 903 (1978); *Raintree of Albemarle Homeowners' Ass'n v. Jones*, 243 Va. 155, 158, 413 S.E.2d 340 (1992).

As suggested by the previous discussion, the defense of waiver is closely related to that of selective enforcement. However, a waiver only occurs "if a radical change takes place *in the whole neighborhood* so as to defeat the purpose of the restriction and render their enforcement inequitable and oppressive. . . ." *River Heights Assocs. v. Batten*, 267 Va. 262, 275, 591 S.E.2d 683 (2004); *Hercules Powder Co. v. Continental Can*, 196 Va. 935, 944, 86 S.E.2d 128 (1955). The testimony of the witnesses for the Defendants failed to demonstrate a radical change to the whole neighborhood since the inception of the Covenants that would make their enforcement inequitable. From outside appearances, only the Marterellas' and Mediterranean Cellars' Wineries demonstrate any type of change.

When Mrs. Marterella was asked on direct examination whether she needed permission to proceed forward with her winery, she stated she "did not need permission," (T., 6/20/09, p. 18.) There was no evidence to suggest that the Homeowners' Association voluntarily relinquished the requirement for the Site Committee's oversight. To the contrary, the Site Committee was active in its meetings and correspondence. No other activities with a commercial component were identified by the Defendants as having proceeded forward without first requesting Site Committee approval.

Joe Papadopoulos sought permission of the BLOC for the construction of his wine building prior to the construction by the Marterellas of their equipment building. He did not assume that the Site Committee Handbook provided absolute authority to him for the construction of his winery. Although he apparently has expanded his use without seeking BLOC's permission to do so, his initial request was in conformity with the Covenants.

The *Deitrick* Case, *supra*, involved one landowner seeking to enforce the Covenant against another landowner in the same subdivision. Defendants' argued that a homeowners' association stands on a different enforcement

footing than a lot owner. However, the Court could locate no authority for that position. In response to an inquiry by BLOC to the lot owners of the subdivision regarding the Marterellas' application in 2004 to establish a winery, 41 of 61 responders opposed the application. This lends more credence, not less, to the BLOC's position that they had the continuing standing to enforce the Covenants.

For the reasons indicated, there is insufficient evidence to support the finding by the jury that BLOC waived its rights to enforce the Restrictive Covenant.

The Court is authorized by statute to enter final judgment, "if there is sufficient evidence before the Court to enable it to decide the case upon its merits." Va. Code § 8.01-430. This Court has heard extensive testimony and received numerous documentary exhibits on the issues presented. Based upon the foregoing, the Court believes it has sufficient evidence to enable it not only to set aside the verdict, but to enter final judgment in favor of the Complainant on the Plea in Equity filed by the Defendants. Therefore, the Plea will be dismissed, and this matter may proceed forward on the prayer for an injunction filed by the Complainant in this matter.